**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alex DANDY, Defendant–Appellant.**

**Nos. 92–1702, 92–1840.**

United States Court of Appeals,
Sixth Circuit.

Argued March 18, 1993.

Decided June 7, 1993.

As Amended Aug. 11, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 15, 1993.

---

Robert Haviland, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Flint, MI, for plaintiff-appellee.

Richard L. Stoper, Jr. (argued and briefed), Robert J. Rotatori (argued and

briefed), Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH, for defendant-appellant in No. 92–1702.

Richard L. Stoper, Jr. (argued and briefed), Robert J. Rotatori (argued and briefed), Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH, Neil H. Fink, Evans & Luptak, Detroit, MI, for defendant-appellant in No. 92–1840.

Before: MILBURN and RYAN, Circuit Judges; and COFFIN, Senior Circuit Judge.*

MILBURN, Circuit Judge.

Defendant Alex Dandy appeals from the judgment of the district court dated May 22, 1992, on his convictions on ten counts of tax offenses, mail fraud, bankruptcy fraud, and obstruction of justice, all resulting from the jury's finding him guilty. He also appeals from the district court's "Corrected Judgment" entered on June 29, 1992, which eliminated an ambiguity in the judgment concerning his parole eligibility date. On appeal, defendant raises the following issues: (1) whether the trial judge erred in ruling that the judge's acquaintance with a government witness did not require his recusal, (2) whether the district court's limitations on cross-examination and its admission of certain evidence denied defendant his Sixth Amendment right to confront witnesses against him, (3) whether prosecutorial misconduct deprived defendant of a fair trial, (4) whether the district court's questioning of witnesses and commenting on the evidence deprived defendant of a fair trial, (5) whether Counts 1 and 2 of the indictment alleging tax evasion are barred by the statute of limitations, (6) whether Count 8 properly charged a violation of the mail fraud statute, (7) whether Count 9 properly charged a violation of the mail fraud statute, (8) whether the district court committed reversible error in refusing to instruct the jury that repayment is a factor to be considered in determining whether a particular transaction is a loan, and (9) whether the district court lacked jurisdiction to enter its corrected judgment.

We affirm in part, vacate in part, and remand.

## I.

### A.

Defendant Alex Dandy purchased and controlled Hamady Brothers Food Markets, Inc. ("Hamady") through a holding company owned by his family trust. Dandy assumed control of Hamady's business in 1981.

McDonald Dairy was Hamady's dairy supplier, and it followed the common industry practice of paying rebates to its customers based on the volume of their purchases. Beginning in late 1981, Dandy directed Hamady's accounting department to cash the rebate checks but to account for them as "gift certificates" issued to "Alex Dandy" rather than as rebates earned by Hamady. Dandy then endorsed each gift certificate and directed the accounting department to apply them as credits to his personal loan account with Hamady, thereby reducing the amount he owed. From 1982 to 1984, Dandy diverted more than $1 million in McDonald Dairy rebates through this gift certificate scheme. He also received small amounts from other wholesalers supplying goods to Hamady. He did not report any of this money on his personal income tax returns for 1982 through 1984.

During this same period, defendant also demanded that McDonald Dairy pay numerous bills he had incurred for items such as airline tickets, televisions, and limousine service. McDonald Dairy paid the bills in order to avoid losing its business with Hamady. Other suppliers also agreed to make such payments at Dandy's direction.

In one scheme, a bank account was opened by defendant's friend, Father Basil Kalekas, under the auspices of the "St. George's Orthodox Church Pastor's Charitable Fund." Nearly all the money deposited to this fund was paid under Dandy's direction by Hamady's suppliers or by Hamady itself. About 80 percent of the money was then withdrawn

---

* Honorable Frank M. Coffin, Senior Circuit Judge, United States Court of Appeals for the First Circuit, sitting by designation.

as cash and given to defendant. Father Kalekas paid some small personal bills for charitable expenses from the fund, but all checks in the amount of $500 or more were paid at Dandy's direction to or on behalf of himself or his friends for their personal use. When Father Kalekas died, defendant demanded and received the remaining $27,000 in the fund from Kalekas' widow. During the years 1982 through 1984 and 1986, Dandy received about $375,000 in such third-party payments, including $157,500 paid to the Pastor's Charitable Fund which Dandy never declared on his personal income tax returns.

Also during late 1981, Dandy began to obtain kickbacks from another Hamady supplier, M & B Distributors ("M & B"). He told M & B to raise the markup M & B charged Hamady by one-half percent and to use the resulting money to pay a salary to Dandy's son-in-law, David Kirdassi. Kirdassi never did any work whatsoever for M & B but received $38,400 yearly from 1982 through 1985 and an additional $6,400 in early 1986. None of these kickbacks were reported on Dandy's income tax returns.

On January 24, 1985, an Internal Revenue Service ("IRS") agent issued a summons to McDonald Dairy for records of rebate moneys it had paid to Hamady "or any officer" of Hamady. Defendant sought to cover up his gift certificate scheme by hiring new accountants, signing a note to pay back Hamady for the rebate moneys he had diverted to his account, and directing Hamady to file amended income tax returns declaring that the moneys were corporate income.

In November 1985, a second IRS subpoena was served on McDonald Dairy for records of rebate moneys paid during 1980, 1984, and 1985. Again, defendant directed McDonald Dairy to give the IRS only those checks payable to "Hamady Brothers Food Markets" and to withhold all checks which represented payments directly or indirectly to himself.

In March 1986, Dandy purchased options to buy all the common stock of Nu–Trax, Inc., d/b/a "Chatham Super Markets" ("Chatham/Nu–Trax"). He also acquired proxies to vote all of the Chatham/Nu–Trax stock, gaining complete and exclusive control over the corporation. Using his control, defendant Dandy caused Chatham/Nu–Trax to greatly increase its purchases from certain suppliers whom defendant directed to inflate their prices in order to pay for such things as a sham salary to his son-in-law and kickbacks to defendant's solely owned corporations, ADI International and Michigan Milk Movers, Inc. The sham salary and kickbacks were for "consulting fees" even though these entities provided no services whatsoever for anyone. The suppliers involved in the schemes included M & B Distributors, McDonald Dairy, and London's Farm Dairy ("London's") and the schemes involved several hundred thousand dollars.

Defendant Dandy also diverted numerous Chatham/Nu–Trax assets to himself causing Chatham/Nu–Trax to sell tractors, trailers, and other equipment to its suppliers at very low prices. He then directed the suppliers to pay the remaining value of this equipment to his wholly-owned corporation, ADI International, as "consulting fees," even though ADI International provided no consulting services. He also directed Chatham/Nu–Trax to pay ADI International over $275,000 in bogus "consulting fees." By 1986, it was clear that bankruptcy was inevitable for Chatham/Nu–Trax. Defendant then sold his worthless option on Chatham/Nu–Trax's remaining stock back to Chatham/Nu–Trax, forcing it to pay him cash and transfer real estate worth over $7 million. However, he kept his proxy for exactly one year and one day in order to prevent Chatham/Nu–Trax from declaring bankruptcy during the one-year period within which his option sale could be rescinded as an avoidable transfer under bankruptcy law. Chatham/Nu–Trax and Hamady declared bankruptcy in 1987.

Dandy then declared on his 1986 income tax returns the $7 million he had received for the sale of the option as a capital gain, thereby reducing the tax declared. However, he omitted from the return income he had received in the form of kickbacks, payments by suppliers for personal services, and sham salaries paid to his son-in-law and his son's girl friend.

### B.

On December 14, 1990, an indictment was returned charging defendant Dandy with tax evasion, willfully filing false returns, mail fraud, and bankruptcy fraud. On April 12, 1991, the grand jury returned a superseding indictment charging defendant in Counts 1 through 3 with tax evasion for the years 1982 through 1984 in violation of 26 U.S.C. § 7201; willfully filing false amended returns for 1982, 1983, and 1986 in Counts 4, 5 and 11 in violation of 26 U.S.C. § 7206(1); obstructing an IRS audit in Count 6 in violation of 18 U.S.C. § 1505; mail fraud in Counts 7 through 9 in violation of 18 U.S.C. § 1341; and bankruptcy fraud in Count 10 in violation of 18 U.S.C. §§ 152 and 2(b). Trial began on September 10, 1991, and concluded on November 20, 1991. The jury returned a verdict of guilty on all counts except Count 7 which had been dismissed by the district court. The district court sentenced defendant to a total of twenty-three years' imprisonment on May 22, 1992, and entered judgment on June 3, 1992. A timely appeal followed. On June 29, 1992, the district court entered a "Corrected Judgment." A timely appeal again followed.

### II.

### A.

■ Defendant Dandy argues that District Judge Cleland should have recused himself pursuant to Dandy's motion under 28 U.S.C. § 455(a) because of Judge Cleland's acquaintance with Douglas Mowat, President of London's Farm Dairy, and with certain members of the London family. We review a district court's refusal to grant a motion for recusal for abuse of discretion. *Easley v. Univ. of Michigan Bd. of Regents*, 906 F.2d 1143, 1146 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991).

Section 455(a) states that

any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

First in chambers and then on the record on May 19, 1991, Judge Cleland informed the parties of his acquaintance with Mowat and the London family. He explained that he had a casual acquaintanceship with Douglas Mowat, an executive of London's, in that he had seen him at community functions, dinners, and fundraisers over the years. However, Judge Cleland stated he had not seen Mowat in over two years, had never been to Mowat's home, and Mowat had never been to his home.

Judge Cleland also stated he had been acquainted with the London family for close to thirty years and that a senior member of the London family, who is no longer associated with London's Farm Dairy, was an "across the street neighbor" when Judge Cleland was in college and law school. He also stated that while he was a prosecuting attorney for St. Clair County, Michigan, Mr. Mowat and "others from the London organization" may have contributed $10 to $20 apiece to his campaign. J.A. 698–700.

■ A district court judge must recuse himself where "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. This standard is *objective* and is not based 'on the subjective view of a party.'" *United States v. Nelson*, 922 F.2d 311, 319 (6th Cir.1990) (citations omitted; emphasis in original), *cert. denied*, —— U.S. ——, 111 S.Ct. 1635, 113 L.Ed.2d 731 (1991). Where the question is close, the judge must recuse himself. *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir.1980).

■ Defendant has sought to characterize Judge Cleland's relationship with the London family as a lifetime friendship. However, Judge Cleland's disclosure reveals that his relationship with the London family and with Douglas Mowat is merely that of an acquaintance, not an intimate, personal relationship or a relationship in which Judge Cleland would be obligated to the London family or to Mowat. *Cf. In re Faulkner*, 856 F.2d 716, 721 (5th Cir.1988). In this case, Judge Cleland was not called upon to evaluate the credibility of Mowat because defendant Dandy was tried by a jury. Furthermore, Mowat was simply one of many government witnesses and did not have a personal stake in the outcome which might have influenced

Judge Cleland.[1] *Cf. Hadler v. Union Bank and Trust Co. of Greensburg,* 765 F.Supp. 976, 979 (S.D.Ind.1991).

Finally, defendant argues that London's was considered by Judge Cleland to be a victim of defendant's crime and that because of his relationship with the London family there is an appearance of partiality in favor of one of the executive officers of London's. Defendant refers to a statement that Judge Cleland made at sentencing in which he said that defendant had "financially seduced merchants." J.A. 764. It is not at all clear from the record that Judge Cleland was referring to London's. Nevertheless, even if he were, the London Dairy Farm was not a victim in the sense that it suffered injury, *i.e.,* it received more business as a result of its agreement to make personal payments to defendant. In any event, Judge Cleland's relationship with the London family and Mowat was not of a sufficiently intimate degree to induce a reasonable person with knowledge of all the facts to conclude that Judge Cleland's impartiality could be reasonably questioned.

**B.**

Defendant Dandy argues that the district court erroneously deprived him of his right to confront witnesses guaranteed by the Sixth Amendment by limiting his cross-examination of several witnesses and by admitting hearsay statements made by witnesses defendant was unable to cross-examine. However, defendant has mischaracterized what actually occurred at trial and the reasons for which the district court limited cross-examination. In most cases, the district court limited cross-examination or re-cross-examination because the questions went beyond the scope of direct or redirect examination. The district court, however, gave defendant the opportunity to call these witnesses himself.

Defendant also argues that the district court erred in allowing hearsay into evidence. At trial, Sylvia Sophiea, a former church secretary who occasionally took messages for defendant Dandy's friend, Father

Kalekas, testified for the government. The government asked her about one occasion when she told Father Kalekas that defendant had telephoned him: "Did Father Bill give you any directions at that time concerning Mr. Dandy?" J.A. 346. Sophiea's answer was that Father Kalekas had angrily replied, "[T]ell him to get off my back and get himself another patsy." J.A. 354. Defense counsel objected on the basis of hearsay. The government argued that it was not hearsay because it was not introduced for the purpose of proving the truth of a matter asserted. Rather, it was offered to establish a breakdown in the relationship between defendant and Father Kalekas. The district court expressed doubt that the statement was in fact hearsay; however, it eventually admitted the statement on the basis that it fell under the excited utterance exception to the hearsay rule. The court later denied defendant's motion for reconsideration stating simply that defendant had presented the same issues for reconsideration previously ruled upon by the court.

The government continues to assert that the statement at issue is not hearsay in that it was not offered to prove the truth of the matter asserted. *See United States v. Ellzey,* 874 F.2d 324, 330 (6th Cir.1989). Relying on *United States v. Cruz,* 805 F.2d 1464 (11th Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987), the government argues that an instruction such as the one given by Father Kalekas to Sophiea is not an assertion capable of being true or false and therefore cannot constitute hearsay. In *Cruz,* a law enforcement officer testified that he had asked one Jeanne Berry to introduce him to her supplier of cocaine. Berry later brought defendant to meet the officer, and thus the officer's statement was highly relevant because one could infer from his statement and Berry's subsequent action that the defendant was Berry's supplier. *Id.* at 1477. The Eleventh Circuit held that this out-of-court-statement was not hearsay because (1) it was not an assertion capable of being true or false, and (2) the statement was offered solely for the fact that it was made

---

1. The government in its brief states that Mowat was one of 56 witnesses.

and the effect it had upon the hearer. *Id.* at 1478.

Defendant is correct in arguing that *Cruz* differs from this case in that Father Kalekas' statement was not offered in order to show the effect that it had upon its hearer, Sophiea. However, the fact remains that Father Kalekas' statement was not offered to prove the truth of the matter asserted. In fact, as previously discussed, his statement was not an assertion. *See United States v. Gibson,* 675 F.2d 825 (6th Cir.1982), *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). Rather, the relevance of this statement lies in the fact that what was said indicated a breakdown in the relationship between Father Kalekas and defendant. Therefore, the district court did not abuse its discretion in admitting the statement. In this connection, we stated in *United States v. Hathaway,* 798 F.2d 902, 905 (6th Cir.1986), that

> when a statement is offered to prove neither the truth nor falsity, there is no need to assess the credibility of the declarant. The significance lies entirely in the fact that the words were spoken. Thus, the statement does not fall within the Rule 801(c) definition of hearsay nor would the purposes of the hearsay rule be served by treating it as hearsay.

Thus, since the statement at issue does not constitute hearsay, it is unnecessary for us to consider whether the statement complies with the excited utterance exception to the hearsay rule.

Defendant next argues that the district court erred in allowing a statement by Wendell Smith, President of Chatham/Nu–Trax, that he knew the price of dairy products at London's rose after defendant took control of Chatham/Nu–Trax because "[t]he people in the dairy department [London's] said that the price of milk had gone up." J.A. 433. Defendant objected to this statement on the grounds of hearsay at trial, and the government agreed. The government also stated that the statement was not offered to prove the truth of the matter assert-

ed and suggested that the district court may wish to give a limiting instruction. In its brief, the government argues that the statement "was offered only to show what Mr. Smith's state of mind was—an issue relevant to Smith's acquiescence in Dandy's scheme to sell the worthless stock option." Government's Brief at 24. The district court responded to the government's suggestion that it give a limiting instruction by stating that "such an instruction is not necessary under the circumstances and the evidence that we have in hand already unchallenged." J.A. 434.

We do not see how the statement at issue is relevant to Smith's acquiescence in Dandy's plan to sell Chatham/Nu–Trax's stock option; nor is it clear how Smith's acquiescence to the plan was relevant in proving defendant's guilt or innocence of the offenses for which he was charged. In any event, a review of the record reveals that the statement was offered to prove that the price of London's milk rose after defendant Dandy took over Chatham/Nu–Trax. Thus, it was inadmissible hearsay. Nevertheless, Mr. Mowat had already testified at the trial that London's prices had risen when defendant Dandy became involved in London's. Therefore, we find that the admission of Smith's statement into evidence constituted harmless error because, as the district court found, evidence of defendant's effect on London's milk prices had already been admitted and was uncontradicted by any other witness.[2] *See Ellzey,* 874 F.2d at 330.

### C.

Defendant Dandy argues that the government engaged in prosecutorial misconduct which warrants a reversal of his conviction. Defendant cites no fewer than twenty instances of alleged prosecutorial misconduct which took place over the ten-week trial. These instances can be grouped into five categories: (1) inflammatory language which prejudiced the jury against defendant, (2) gestures and facial expressions calculated to

---

**2.** Defendant states that Mowat's testimony was "hotly contested"; however, defendant cites to no other witnesses who disputed Mowat's testi-

mony. Rather, defendant focuses on Mowat's credibility as a witness.

be prejudicial to defendant, (3) interjection by government counsel of himself as a witness at trial and asking questions without a factual basis, (4) interruptions designed to disrupt defense counsel, and (5) improper comments on the evidence.

█ Prosecutorial misconduct warrants reversal of a conviction only if it "permeates the entire·atmosphere of the trial." *United States v. Cummins*, 969 F.2d 223, 227 (6th Cir.1992). Determining whether an error is reversible requires a review of the record as a whole. *United States v. Solivan*, 937 F.2d 1146, 1155 (6th Cir.1991). Factors to consider are the strength of the evidence against the defendant, the potential for prejudice to the defendant, and the timing and firmness of the district court admonition, if any. *Cummins*, 969 F.2d at 227; *Solivan*, 937 F.2d at 1157. Where the government's conduct is, in fact, unconstitutional, "[i]t is incumbent upon the government to demonstrate that such constitutional error, resulting from the admission of highly prejudicial evidence or comment, is harmless beyond a reasonable doubt." *Solivan*, 937 F.2d at 1155.

A review of the record reveals that this was a heated trial and that emotions ran high on each side. The district.court cautioned counsel for both the defense and the government regarding potentially prejudicial conduct such as excessive facial expressions, gestures, gasps, and loudly whispered conversations between attorneys seated at counsel's table. In each case where the prosecutor became too zealous, the district court acted promptly to respond to the defense's objections.and admonish the prosecutor.

As previously stated, defendant argues that the prosecutor interjected himself as a witness in the trial and asked questions for which there was absolutely no factual basis. At trial, the prosecutor attempted to question defense witness Norris Toney, a former commissioner with the Human Relations Commission of the City of Flint where he worked to raise money to assist people in the community, regarding whether he had delivered

money for a Mr. Barge, his then supervisor, to a General Motors supervisor.

> Question: You never delivered any payments of any money for him [Mr. Barge] to GM officials?
> Answer: No.

> Question: Well, you did, in fact, testify about that, didn't you, sir?
> Answer: Yes, I did.

> Question: Is that not true, sir? Mr. Toney, did you not testify that you delivered money from Warren Barge to a .General Motors supervisor?
> Answer: No.

J.A. 610.

Defendant argues that the government had absolutely no factual basis with which to question defense witness Toney regarding a delivery of money to a General Motors supervisor. In *United States v. Brown*, 519 F.2d 1368, 1370 (6th Cir.1975), we held that the government committed reversible error by questioning a witness regarding previous testimony in another court proceeding where the records of the trial provided no basis for the government's questions. Later in the proceedings in this case, however, and out of the presence of the jury, witness Toney did in fact admit that he had delivered money from Barge to a General Motors supervisor. J.A. 615.[3] Thus, a factual basis did exist for the prosecutor's questions.

█ Defendant also objects to certain questions the government asked of Toney regarding his relationship with one Mattie Fordham. The prosecutor asked Toney if he were aware that Ms. Fordham, with whom he worked on the Human Relations Commission, had pled guilty to a federal crime and had been convicted of a federal crime. *These questions were not asked in front of the jury, but defendant moved for a mistrial.* At a later hearing on this motion, the prosecutor stated that a search of his records revealed

---

**3.** Toney stated that he did deliver ·money to a Don Anderson, a GM supervisor, "for the pur-

pose of his house." J.A. 615.

that Ms. Fordham had not been convicted of a federal crime but that several years earlier he had agreed to put Ms. Fordham in a pretrial conversion program because of her misapplication of the Human Relations Commission's funds. The prosecutor also stated that a search of his records revealed he had prosecuted several of Ms. Fordham's family members for federal crimes. Because the jury never heard this line of questioning, it could not have prejudiced the jury against defendant, and, therefore, even though the prosecutor's questions were improper, they do not warrant reversal.

 Defendant also argues that in his closing argument, the prosecutor, while vouching for a witness's credibility, made highly prejudicial comments which warrant reversal. The following took place during the government's closing argument:

Prosecutor: But Mr. McColgan is an honest man, he told the truth to the FBI and he told the truth to you. . . .

Defense Counsel: Your honor, I'm going to object to the prosecution vouching for the credibility of the witness, giving his opinion as to the credibility of the witness.

The Court: There may be merit to that objection, Mr. Haveland [sic]. The argument should be restricted to the evidence and reasonable inferences from the evidence.

Prosecutor: Your Honor, this is all the evidence. This is the testimony of Mr. McColgan.

The Court: Let me clarify that any assertions that are made from evidence, inferences from precise evidence and—continue with your argument—[sic] distinguishing the merits of the objection just raised.

Prosecutor: Well, to make it clear, ladies and gentlemen, everything I am telling you is based on the evidence in this case. If you don't remember it the way I am saying it, disregard what I say. Rely on what you heard. I believe Mr. McColgan told you that he had told the truth to the FBI when he was interviewed by Agent Clemmer on two or three occasions in previous years. He admitted to Agent Clemmer that he had, indeed, paid this kickback. He was subpoenaed to testify in this case, he was

under oath, he told you he didn't lie to anyone and he wasn't lying to you.

And my point is why would he lie about this? If there were any incentive on his part to lie, it would have been to deny that he had paid a kickback.

J.A. 744–46.

It was improper for the prosecutor to state that Mr. McColgan is honest. Such a statement conveys a conviction of personal belief regarding the witness's veracity. *See United States v. Bess,* 593 F.2d 749, 755 (6th Cir. 1979) ("expressions of personal belief of innocence or guilt of an accused are error"). However, the district court immediately instructed the jury that all assertions are to be made from the evidence. The prosecutor then told the jury to "disregard what I say" if it did not find his statements based on the evidence. J.A. 745. Moreover, while the prosecutor's statement was improper, it was not as egregious as it might have been had the prosecutor used the phrase "I believe" that Mr. McColgan is honest. *Cf. Bess,* 593 F.2d at 757 (holding that prosecutor's misconduct constituted reversible error where the prosecutor stated "I believe beyond a reasonable doubt" that the defendant was guilty and the district court failed to give immediate curative admonishment). Given the degree of egregiousness of the prosecutor's statement, the weight of the evidence against defendant, and the district court's immediate curative instruction to the jury, the prosecutor's misconduct did not constitute reversible error. *See United States v. Krebs,* 788 F.2d 1166, 1177 (6th Cir.1986), *cert. denied,* 479 U.S. 930, 107 S.Ct. 400, 93 L.Ed.2d 353 (1986) (holding that prosecutor's statement "I want to suggest to you that in this trial testimony she was telling the truth" did not constitute reversible error given the substantial evidence against the defendant and the trial court's corrective measures to eliminate prejudice).

### D.

▪██ Defendant Dandy argues that he was deprived of a fair trial by the district court's questioning of witnesses and commenting on the evidence. In *United States*

*v. Slone,* 833 F.2d 595, 597 (6th Cir.1987), we stated:

> The presiding judge should conduct a trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties. He must see that the issues are not obscured and that the testimony is not misunderstood. The trial court has the right to interrogate witnesses for this purpose.

> The presiding judge, however, must be careful to " 'always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury.' " " 'The basic requirement is one of impartiality and demeanor as well as in actions.' "

(Citations omitted.) We also noted three instances in which a district court "has good reason to interject himself into the trial." *Id.* First, judicial intervention may be necessary for clarification in a lengthy and complex trial. Second, it may be necessary for clarification where attorneys are unprepared or obstreperous or if the facts are becoming confused and neither side is able to resolve the confusion. Third, judicial intervention may be necessary if a witness is difficult or if the witness's testimony is not credible and the attorney fails to adequately probe the witness or if the witness becomes inadvertently confused. *Id.; see also United States v. Blakeney,* 942 F.2d 1001, 1013 (6th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991) *and* — U.S. —, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992); *United States v. Seago,* 930 F.2d 482, 492 (6th Cir. 1991).

Defendant's argument is meritless. First, the district court did engage in lengthy questioning of a witness regarding the definition of the terms "backdating," "imputed interest," and "net operating loss carryover." J.A. 408–417. Defendant objected on the grounds that the district court's inquiry into those areas "gives an impression to the jury that the Court feels that these particular areas are more important than the other areas." J.A. 420. The district court noted defense counsel's objection and then gave a long cautionary instruction to the jury not to form an opinion regarding the case simply on the basis that the court had asked these questions.

Second, one juror submitted a question asking, "Why would you have included payments to Kirdassi as income to Mr. Dandy when the W–2 was made out to Kirdassi." J.A. 447. Defendant objected on the grounds that the prosecution's theory was once again being emphasized to the prejudice of defendant. The district court then asked a series of questions designed to answer the juror's question.

Third, the court questioned a witness regarding the difference between a gift and a bribe. Defendant objected on the grounds that the question highlighted the government's case, was prejudicial, and gave the jury the impression that the district court was prejudiced against defendant. Defendant also now argues that the questions were prejudicial because the witness, an IRS agent, testified that any business entertainment given by one business to another business over $25 had to be reported as income by the recipient, and if it was not, then the IRS treated it as a bribe.

As we have stated in *Slone,* "[t]he fact that testimony elicited by the trial judge may have damaged appellant's case, does not automatically cast the court in the improper role of surrogate prosecutor." 833 F.2d at 600 (citation omitted). This was a long and complicated case conducted over a period of ten weeks and involving difficult concepts. The district court was justified in reviewing those difficult concepts which were crucial to the disposition of the case. From the record, it is apparent that when initially presented by the witnesses, many of these concepts were not fully explained in terms that a layman could understand.

Moreover, the questions were stated in a neutral manner. The court did not interrupt examination by either party's counsel and gave defense counsel an opportunity for follow-up after it asked questions. In addition, as previously mentioned, the district court at one point gave a lengthy cautionary instruction to the jury. Therefore, we conclude that the district court's questioning did not deprive defendant of a fair trial. *See Slone,*

833 F.2d at 600–601 (holding that the district court did not act improperly by asking witness questions where it did not interfere with defendant's cross-examination rights, court gave the opportunity for follow-up questions, asked questions for the purpose of clarification, and gave a cautionary instruction to the jury). In addition, the district court's occasional summary of the witness's explanations was not improper. "A federal judge may analyze the evidence, comment upon it, and express his views with regard to the trial testimony and the witnesses." *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933), *overruled on other grounds, Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *see also Blakeney*, 942 F.2d at 1013 (holding that a district court may "analyze and dissect the evidence, as long as the district judge does not distort or add to it"). In this case, the district court was careful to comment and summarize in a neutral manner for the purpose of clarification, neither adding to nor distorting the evidence.

### E.

Defendant Dandy argues that Counts 1 and 2 of the superseding indictment charging tax evasion under 26 U.S.C. § 7201 are time-barred under the applicable statute of limitations and that insufficient evidence exists to support his conviction on these counts. Counts 1 and 2 of the original indictment allege tax evasion occurring on June 13, 1983, and July 3, 1984, the dates on which the income tax returns for tax years 1982 and 1983 were filed. 26 U.S.C. § 6531 provides a six-year statute of limitations period for tax evasion, and the original indictment was filed on December 14, 1990, more than six years after the tax returns were filed. However, the government filed a superseding indictment alleging that *acts of evasion* relating to tax years 1982 and 1983 occurred through November of 1985. Defendant argues that the statute of limitations began to run for each count on the date that each tax return was filed. The government argues, however, that the statute of limitations for each count of tax evasion began to run only when the last affirmative act of evasion oc-

curred, thus bringing Counts 1 and 2 within the six-year statute of limitations period.

In *United States v. Hook*, 781 F.2d 1166, 1173 n. 9 (6th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), we declined to decide whether the limitations period begins to run when income tax returns are filed or due or whether the limitations period begins to run at the last affirmative act of evasion in furtherance of the crime. However, the two circuits which have addressed this specific issue have held that it is the date of the latest affirmative act of evasion that triggers the statute of limitations. *See United States v. Winfield*, 960 F.2d 970, 973 (11th Cir.1992) (per curiam); *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir.1986), *cert. denied*, 480 U.S. 950, 107 S.Ct. 1613, 94 L.Ed.2d 798 (1987). We adopt the First and Eleventh Circuits' approach to this issue because to hold otherwise would only reward a defendant for successfully evading discovery of his tax fraud for a period of six years subsequent to the date the returns were filed. For example, in this case, defendant's evasive acts in 1985 prevented the IRS from learning about defendant's income tax fraud occurring in 1982 and 1983.

Defendant relies on *United States v. Habig*, 390 U.S. 222, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968), to support his argument that the statute of limitations should begin to run at the time the return is filed. In *Habig*, the Supreme Court held that the statute of limitations for an attempt to evade taxes by filing a false return under 26 U.S.C. § 7201 began to run on the date that the returns were actually filed, not the date that they were due to be filed. The Court determined that to hold otherwise would be to accept the argument that "Congress intended the limitations period to begin to run before [defendants] committed the acts upon which the crimes were based." *Id.* at 225, 88 S.Ct. at 928.

*Habig* actually supports the position that the statute of limitations for income tax evasion alleged in Counts 1 and 2 in this case did not begin to run until the last affirmative evasive acts occurring sometime in Novem-

ber of 1985. This conclusion is so because it is these evasive acts, occurring within six years of the superseding indictment, which form the basis of the crimes alleged in Counts 1 and 2 of the superseding indictment. Finally, this result seems reasonable when one considers the fact that had it not been for defendant's evasive acts in 1985, the IRS would very likely have discovered defendant's income tax fraud occurring in 1982 and 1983. To hold that the statute of limitations for income tax evasion occurring in 1982 and 1983 began to run on the date the returns were filed would reward defendant for successfully evading discovery of his tax fraud for a period of six years subsequent to the date the returns were filed.

Defendant next argues that the evidence is insufficient to sustain his conviction on Counts 1 and 2. In this case, although defendant made a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case and at the close of all the evidence, defendant never argued to the district court that the evidence was insufficient on Counts 1 and 2. Following the close of the government's case, defendant's counsel made the following argument to the district court, merely reasserting his pretrial motion to dismiss on statute of limitations grounds:

> MR. ROTATORI: Okay, your Honor, with regard to Counts 1 and 2, I think we can take them together and save time because the argument for both are [sic] the same.

> With regard to Counts 1 and 2, the defendant in support of its motion for a judgment of acquittal pursuant to Rule 29, incorporates by reference, the legal memorandum submitted to the Court when the defendant moved to dismiss Counts 1 and 2 based upon the statute of limitations.

> THE COURT: So you have a statute of limitations issue which is—which we have roundly discussed, and I have denied.

> And is there any additional basis found within the evidence here at trial or lack—asserted lack of evidence with regard to any points in that case?

> MR. ROTATORI: Substantively we have no Rule 29 motion with regard to Counts 1—

> THE COURT: Procedurally you wish to reiterate your motion—I don't even know it's necessary to do that, but in an abundance—

> MR. ROTATORI: Just briefly. At the time we made the motion prior to trial, we did not have the testimony of, I think, the most critical witness with regard to the government's position that the statute of limitation was extended with regard to Counts 1 and 2 because of the allegation in the superseding indictment. . . .

Trial transcript, Vol. XVII at 143–45. Defendant's counsel then proceeded to argue that there was insufficient evidence to support the conviction on Count 6, charging obstruction of justice, and that the failure of that charge would require dismissal of Counts 1 and 2.

At the close of all the evidence, defendant's counsel stated:

> MR. LORD: We would make a general *renewal* of our Rule 29 motions at the end of the case.

> THE COURT: So noted.

> MR. LORD: I would make a specific renewal as to two particular counts.

Defendant's counsel then made specific arguments that the evidence was insufficient on Counts 6 and 7. Trial transcript, Vol. XXXVI at 9–11 (emphasis added). The district court then rejected defendant's challenge to the sufficiency of the evidence on Count 6, and defendant has not contested that ruling in this appeal.

 This court will not entertain a defendant's challenge to the sufficiency of the evidence on appeal unless the defendant moved for a judgment of acquittal under Rule 29 at the close of the government's case-in-chief and at the close of all the evidence. *United States v. Williams*, 940 F.2d 176, 180 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991). Such a failure to make the required Rule 29 motions constitutes a waiver of an objection to the sufficiency of the evidence. *Id.* Although specificity of grounds is not required in a Rule 29 motion, *see United States v.*

*Gjurashaj,* 706 F.2d 395, 399 (2d Cir.1983), where a Rule 29 motion is made on specific grounds, all grounds not specified are waived:

> However, where as here a motion for acquittal is made on specified grounds which do not include any objection to venue, we think that objection has been waived. The specification of grounds in the motion is an indication that counsel has evaluated the record and has these particular reasons for his motion. His omission of venue from those reasons is similar to a general failure to move for acquittal in spite of the government's failure to provide any substantial evidence to support the alleged venue. In the latter circumstances, the Sixth Circuit found the objection waived, *United States v. McMaster,* 343 F.2d 176, 181 (6th Cir.), *cert. denied,* 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965); *cf. United States v. Michelson,* 165 F.2d 732, 734 (2d Cir.) (dictum), *aff'd,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).
>
> The Ninth Circuit has found waiver where the defendant made a motion to acquit on specific grounds and did not mention venue. *Gilbert v. United States,* 359 U.S. 285, 288 (9th Cir.), *cert. denied,* 385 U.S. 882, 87 S.Ct. 169, 17 L.Ed.2d 109 (1966); *United States v. Brothman,* 191 F.2d 70, 72–73 (2d Cir.1951) (dictum). We think this the proper result. It is not unreasonable to expect the defendant to make some reference to the venue point in order to save his objection for appeal. Where he moves to acquit without specification, we might assume venue to be included among his unarticulated disagreements with the conduct of the case, but where he does specify grounds for the motion and omits mention of venue we must conclude that he cannot be considered to have raised a question concerning the place of trial. Since there can be no doubt that Rivera did move for acquittal on specific grounds without mention of improper venue at that time, he waived any objection he may have had.

*United States v. Rivera,* 388 F.2d 545, 548 (2d Cir.), *cert. denied,* 392 U.S. 937, 88 S.Ct. 2308, 20 L.Ed.2d 1396 (1968).

From the record, it appears that defendant's Rule 29 motion did not challenge the sufficiency of the evidence. After being directly asked by the court whether he challenged the sufficiency of the evidence, defendant's counsel replied that he did not. Moreover, the foregoing authorities make it clear that because defendant asserted specific grounds for his Rule 29 motion, viz., the statute of limitations, defendant has waived all other grounds. Further, at the close of all the evidence, defendant merely adopted his previous motion, which we have found inadequate. Therefore, we hold that defendant has waived his challenge to the sufficiency of the evidence on Counts 1 and 2.

### F.

Defendant Dandy argues that his conviction on Count 8 for mail fraud in violation of 18 U.S.C. § 1341 must be reversed because it was based on a theory not recognized in this circuit nor alleged in the indictment. Specifically, defendant argues that the indictment sets forth a constructive trust theory which is inadequate to sustain his conviction for mail fraud. Under the constructive trust theory, any economic benefit acquired by a fiduciary as a result of a breach of his fiduciary duty owed to a principal is held in trust for the principal. *United States v. Runnels,* 833 F.2d 1183, 1188 (6th Cir.1987), *vacated on other grounds,* 877 F.2d 481 (6th Cir.1989). The constructive trust theory does not require that the *principal* has suffered some actual economic loss, simply that the *fiduciary* has benefited economically from his breach. *Id.* at 1187.

The superseding indictment charges that defendant "devised and executed a scheme and artifice to defraud Nu–Trax, Inc., d/b/a Chatham Super Markets, by obtaining money which by law should have been paid or credited to an account of Nu–Trax, Inc." The district court instructed the jury that the director of a corporation is a fiduciary of the corporation and that it is his duty to make the best bargains possible for the corporation and that any property received from transactions he conducts on the corporation's behalf belong to the corporation. The district court also instructed the jury that it was not suffi-

cient that defendant may have simply breached his duty toward the corporation, unless that breach involved money or property belonging to or required to be delivered to the corporation.

In this case, the indictment and the jury instructions make it clear that the defendant could not be found guilty of mail fraud simply on the basis that defendant as a fiduciary profited from his breach of his fiduciary duty. Rather, as the Supreme Court indicated in *McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987), Chatham/Nu–Trax must have suffered a specific property loss above and beyond that created by defendant's fiduciary duty to the corporation. Here the evidence was that London's Farm Dairy would have charged Chatham/Nu–Trax lower prices for milk had it not been for the kickbacks they had to pay to defendant. Because the indictment, evidence, and jury instructions are all based on concrete economic harm to Chatham/Nu–Trax, defendant's argument must fail. *See United States v. Asher*, 854 F.2d 1483, 1494 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989) ("those cases that have *sustained* mail fraud convictions have done so where the 'bottom line' of the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state.").

### G.

■ Defendant Dandy argues that his conviction on Count 9 for mail fraud in violation of 28 U.S.C. § 1341 must be reversed because the indictment alleges that defendant engaged in a scheme to defraud the "future" creditors of Chatham/Nu–Trax. According to defendant, a future creditor has no tangible property interest and thus has no enforceable property right under the mail fraud statute. However, Count 9 of the superseding indictment alleged that defendant defrauded Chatham/Nu–Trax *and* its future creditors. In its instructions to the jury on Count 9, the district court instructed the jury that it must find the defendant defrauded Chatham/Nu–Trax. It did not refer to future creditors. Therefore, the jury could not have convicted defendant on Count 9 unless

it found defendant had defrauded Chatham/Nu–Trax, and thus, it is unnecessary for us to consider defendant's argument in regard to future creditors. *See United States v. Ochs*, 842 F.2d 515, 520 (1st Cir.1988).

■ Defendant also argues that his conviction under Count 9 must be reversed because the district court instructed the jury to consider defendant's status as a fiduciary in determining whether defendant had defrauded Chatham/Nu–Trax under Count 9. However, the indictment alleged that defendant defrauded Chatham/Nu–Trax of $7 million in assets which belonged to the company. These assets are concrete property interests, and simply because defendant possessed a fiduciary relationship to Chatham/Nu–Trax which enabled him to defraud the company of $7 million in assets does not render his conviction invalid. *See McNally*, 483 U.S. at 360, 107 S.Ct. at 2881.

### H.

■ Defendant Dandy argues that the district court committed reversible error in refusing to instruct the jury that repayment is a factor to be considered in determining whether a particular transaction is a loan. At issue on Counts 1 through 5 was whether the payments defendant received from Hamady constituted taxable income or loans. Defendant's theory of defense was that the payments were loans and defendant offered as evidence of this theory the fact that defendant eventually repaid the money to Hamady. The district court simply instructed the jury that it must consider whether any funds received by defendant constituted ordinary income or loans and that it must consider all circumstances surrounding such payments.

It is reversible error not to present a defendant's theory of defense adequately in a full statement of the law. *United States v. Duncan*, 850 F.2d 1104, 1118 (6th Cir.1988). However, the district court did fully present defendant's theory of defense to the jury by explaining that it must determine whether the money given from Hamady to defendant was income or a loan. The fact that defendant eventually repaid the money to Hamady is evidence which the jury may consider in

determining whether the money was a loan or income, but it is not a legal theory standing alone. Therefore, the district court's refusal to give defendant's specific instruction was not error. *See id.*

## I.

The government agrees with defendant Dandy that the district court lacked jurisdiction to file its "corrected judgment" more than seven days after it entered the original judgment. Federal Rule of Criminal Procedure 35(c) authorizes the district court to correct its judgment for clerical errors only within seven days after the sentence was imposed. The original judgment stated that the terms of the sentence "ought to be served consecutively under the provisions of 18 U.S.C. § 4205(a) which provides that defendant shall be eligible for parole at such date as the parole commission may determine." However, former 18 U.S.C. § 4205(a), which is applicable to this case, provided that "a prisoner shall be eligible for release on parole after serving one-third of such term or terms...." The corrected judgment states that the terms of the sentence "shall be served consecutively under the provisions of 18 U.S.C. § 4205(a)." It appears that the district court made a simple error and attempted to correct it. Therefore, the corrected judgment should be vacated and the original judgment be remanded to the district court in order to resolve the contradiction as to defendant's parole eligibility date.

## III.

For the reasons stated, the June 29, 1992, corrected judgment of the district court is VACATED, and the June 3, 1992, judgment of the district court is REMANDED to the district court for the purpose of correcting the judgment in order that it conforms to the express intentions of the district court as stated at sentencing and with the language of former 18 U.S.C. § 4205(a) as it applies to defendant. In all other respects, the district court is AFFIRMED.