NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0348n.06

No. 08-2163

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jun 07, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| RICHARD MONTGOMERY, | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Before:  MARTIN, RYAN, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge.  After a jury trial in 1998, Richard Montgomery was convicted of one count of conspiracy, in violation of 18 U.S.C. § 371; 20 counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346; and one count of violating the Medicare anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2).  Montgomery failed to appear for sentencing and remained at large until 2008. The district court thereafter sentenced him to 51 months' imprisonment on each count, all running concurrently.  On appeal, Montgomery argues that we should vacate one of his mail-fraud convictions because the government failed to produce evidence of a mailing, and he challenges the district court's imposition of an aggravating-role sentence enhancement.  We reject his arguments and affirm.

I.

From 1992 to 1996, Montgomery owned a one-third share of several interrelated companies that performed diagnostic tests in chiropractors' offices, ostensibly to provide objective verification of suspected spinal problems. In fact, however, the tests were worthless for that purpose.

In addition to his ownership interest, Montgomery acted as one of the companies' principals. He personally directed the companies' marketing efforts, which primarily emphasized two benefits to participating chiropractors. First, the chiropractors could increase their revenue by offering the tests, which not only bolstered their efforts to obtain insurance payments but also helped them to maintain control over their patients by avoiding outside referrals. Second, Montgomery's companies paid the chiropractors for referring patients, initially through explicitly volume-based payments and later by nominally leasing space in the chiropractors' offices.

Montgomery's companies charged significantly higher rates for their tests than neurologists charged to perform those same tests for valid diagnostic purposes. Initially, the companies promised participating chiropractors that they would accept whatever reimbursement that insurance companies were willing to pay, and that they would not bill patients for the difference. Eventually, however, one insurer, Blue Cross Blue Shield of Michigan ("Blue Cross"), decided to stop paying for the tests. At that point, the companies began aggressively pursuing patients for payment.

At some point along the way, the FBI's health-care-fraud unit began investigating Montgomery's companies. As part of that investigation, agents arranged a sting operation in which they had a chiropractor refer several healthy patients for testing. The FBI also identified several chiropractors who had used the testing services and offered them the opportunity to help expose the scheme in exchange for non-prosecution or favorable plea agreements. The investigation culminated

in this 27-count indictment against both Montgomery and his daughter Patricia Sittloh, who was another part owner of the companies. Sittloh pled guilty to the conspiracy charge in exchange for the government's agreement to drop the mail-fraud and kickback charges. Montgomery proceeded to a jury trial.

At trial, the government presented several witnesses who testified to Montgomery's direct involvement in various aspects of the scheme. The government also produced marketing letters he had signed and an attorney's letter addressed to him that discussed the lease arrangements. Finally, the government produced two sets of insurance-claim forms: one seized from Montgomery's companies, and the other provided by Blue Cross. The forms were identical except that Blue Cross had stamped its copies as "received" after they had been delivered via mail. When the government concluded its case-in-chief, however, it voluntarily dismissed five of the mail-fraud counts because it had not been able to locate Blue Cross's copies of the corresponding claim forms. The jury returned a guilty verdict on all remaining counts after about three hours' deliberation.

Montgomery failed to appear for his sentencing hearing, so the district court issued a warrant for his arrest. He successfully evaded capture for more than nine years, but was finally apprehended in 2008. The court ordered an updated presentence investigation report, which scored Montgomery's offense level at 21 and placed him in criminal-history category I. Montgomery's resulting guidelines range was 37-46 months. The court recalculated Montgomery's offense level to be 24, however, reducing the amount of money for which Montgomery was held responsible, but adding a 4-level aggravating-role adjustment based on a determination that he was a leader and an organizer of an

extensive criminal activity. *See* U.S.S.G. § 3B1.1(a). Montgomery's new guidelines range was 51-63 months. The court sentenced him to 51 months' imprisonment.

This appeal followed.

## II.

## A.

Montgomery challenges the district court's denial of his motion for acquittal under Federal Rule of Criminal Procedure 29 on one of the mail-fraud charges. He argues that the government failed to produce any evidence that the claim form that was the subject of count 11 had been sent via mail. *See United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) ("Mail fraud consists of (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme"). Montgomery's argument depends on an inference that exhibit GX11b—which the government has provided as part of the record on appeal—was missing at trial, based on the Assistant United States Attorney's failure to say "11b" while reciting a list of exhibits that he was handing to a witness.

"Specificity in a Rule 29 motion is not required." *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005). "When a defendant makes a motion on specific grounds, however, all grounds not specified in the motion are waived." *Id.* The distinction is practical: When an acquittal motion is general, we have no basis for including or eliminating possible grounds for the motion. We are therefore willing to "assume" the existence of "unarticulated disagreements[.]" *See United States v. Dandy*, 998 F.2d 1344, 1357 (6th Cir. 1993). In contrast, "[t]he specification of grounds in the motion is an indication that counsel has evaluated the record and has these particular reasons for his motion." *Id.*

Montgomery cited "a lack of sufficient evidence" in making his Rule 29 motion. (Trial Tr. vol. 4, 197, Dec. 21, 1998.) But his argument was more specific—which is to say more restrictive—than that. In his motion, Montgomery expressly told the district court that "[t]he argument is the same" as to "each and every count." *Id.* That representation was to the exclusion of the argument he makes here, which is unique to count 11. The inconsistency between the two arguments is enough to render the current argument waived. *Wesley*, 417 F.3d at 617.

That result is only fair here. If Montgomery thought that a single exhibit was missing from the ones necessary to convict him for mail fraud, he should have told the district court as much right then and there, rather than only raise the issue with this court 12 years later. The district court could have easily resolved the dispute on the spot. We will not reverse the district court on such a ground.

B.

Montgomery also challenges the district court's application of a 4-level increase to his offense-level calculation, based on the court's finding that he was a leader and an organizer of the criminal activity. Montgomery argues that there is no evidence in the record to support that factual determination. He concedes, however, that he failed to object to the enhancement on this basis and that our review is therefore only for plain error. *See United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006).

Several circuits have held that "[q]uestions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error." *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991); *see also United States v. Bush*, 405 F.3d 909, 922 (10th Cir. 2005); *United States v. Elion*, 15 F. App'x 14, 16 (1st Cir. 2001); *United States v. Alford*, No. 93-5073,

1994 WL 258412, at *2 (4th Cir. June 14, 1994) (unpublished).  This case does not require us to go that far, because the government's witnesses and physical evidence easily support the district court's finding here.

The district court's judgment is affirmed.