FILED
United States Court of Appeals
Tenth Circuit

May 7, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PATRICK DWAYNE MURPHY,

    Defendant - Appellant.

No. 22-7021

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:20-CR-00078-RAW-1)**
_____

David B. Autry, Attorney at Law, Oklahoma City, Oklahoma, for Defendant-Appellant.

Jarrod A. Leaman, Assistant United States Attorney (Linda A. Epperley, Assistant United States Attorney, Christopher J. Wilson, United States Attorney, with him on the brief), Office of the United States Attorney, Eastern District of Oklahoma, Muskogee, Oklahoma, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**HOLMES**, Chief Judge.

_____

    Defendant-Appellant Patrick Murphy appeals his convictions for murder, murder in perpetration of kidnapping, and kidnapping resulting in death. He raises three issues on appeal. First, he argues that there was insufficient evidence to sustain

his convictions for murder in perpetration of a kidnapping and kidnapping resulting in death. Second, he maintains that the government's prosecution was barred by the statute of limitations. Third, he asks us to find that the nearly two-decade-long delay between the murder and this federal prosecution violated his Fifth Amendment due process rights.

We conclude that Mr. Murphy's first, sufficiency-of-the-evidence argument is persuasive: more specifically, we hold that even viewing the evidence in the light most favorable to the government, it does not show that Mr. Murphy held the victim for an appreciable period of time, which is a requirement under the federal kidnapping statute. However, we reject Mr. Murphy's other two arguments. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm in part** and **reverse in part.** Specifically, we **reverse** Mr. Murphy's kidnapping-related convictions but **affirm** his conviction for murder. We **remand** the case to the district court for resentencing.

**I**

**A**

**1**

In August 1999, Mr. Murphy had dated his then-girlfriend, Patsy Jacobs, for roughly five years.[1] Their relationship was marked by Mr. Murphy's desire to control

---

[1]    The facts in this opinion are drawn from those adduced at Mr. Murphy's federal trial. Nothing here is taken from his now-vacated state conviction. *See Murphy v. State*, 47 P.3d 876, 879 (Okla. Crim. App. 2002).

2

Patsy's life.[2]  Mr. Murphy was a jealous man, particularly when it came to Patsy's ex-partner and father of one of her children—George Jacobs.  He did not hide his animosity toward George and frequently shared his suspicions that George and Patsy were still romantically involved.

On August 26, 1999, Mr. Murphy and Patsy argued and he demanded to know whether Patsy had seen George that day.  Mr. Murphy's anger escalated, and he threatened to kill George and George's sons "one by one."  R., Vol. III, at 97 (Trial Tr., dated Aug. 3–5, 2021).

**2**

Two days later, on August 28, 1999, Mr. Murphy went to help his cousin, Mark Taylor, move some furniture.  The two spent the day together, drinking beer as they worked.  Later that evening, the two met up with another cousin—Billy Jack Long—who joined them as they continued drinking.  After some time, Mr. Murphy, Mr. Taylor, and Mr. Long got in Mr. Murphy's pickup truck and drove around before going to Mr. Murphy's trailer.  Mr. Taylor eventually left the other two for the night.

After Mr. Taylor's departure, Mr. Murphy and Mr. Long drove to Katherine King's house.[3]  At the time, Katherine was dating George Jacobs Jr.—George's son.  When Mr. Murphy and Mr. Long arrived at Katherine's home, Mr. Murphy came to the

---

[2]     Because some individuals referenced in this case are related and share the same surnames, we refer to them by their first names to avoid confusion.

[3]     Katherine has now changed her last name to Jacobs but, at the time of these events, it was King.  We therefore refer to her as Katherine King (or Katherine) for the purpose of this factual overview.

back door and asked Katherine if George Jr. was home.  Katherine was worried, and with good reason; she knew that, a few weeks earlier, Mr. Murphy had threatened to kill George and his family.  Katherine demanded that Mr. Murphy leave her property, or she would "call the cops."  *Id.* at 213.  Mr. Murphy and Mr. Long left, but not before Katherine's fourteen-year-old son—Kevin King—joined the two men.  Kevin had "already been drinking" that evening and brought more beer with him.  *Id.* at 362.

The new trio soon decided to seek out a game of pool.  Because Kevin was underage, Mr. Murphy settled on an establishment that he believed would allow Kevin to enter: a bar in Vernon, Oklahoma.

As the three drove toward the bar, George was leaving it.  He too had spent the day drinking alcohol, with a friend and relative named Mark Sumka.  That evening, George and Mr. Sumka had stopped by the bar in Vernon to eat dinner and continue drinking.  By the time they left, George was too drunk to drive; Mr. Sumka drove George's car while George was "passed out."  *Id.* at 242.

As Mr. Sumka drove George's car away from the bar, with George inebriated and incapacitated alongside him, they passed by Mr. Murphy, Mr. Long, and Kevin as the trio drove toward Vernon.  The two groups intersected on Vernon Road in a rural area of McIntosh County, Oklahoma.  Seeing Mr. Murphy—who was also a relative of his— driving down the road, Mr. Sumka pulled over to greet him.

**3**

The two vehicles stopped on opposite sides of the road—George's car going away from the bar, Mr. Murphy's truck heading toward it.  Mr. Murphy asked Mr. Sumka who

4

was in the car with him. Mr. Sumka responded that it was George but, knowing that Mr. Murphy and George "didn't get along," he "took off" in the car down the road—with George still an unconscious passenger. *Id.* at 241. Mr. Murphy, Mr. Long, and Kevin turned around, chased them down in Mr. Murphy's truck, and blocked them in. By the time Mr. Sumka managed to get out of the driver's seat, Mr. Long and Kevin had already dragged George out of the car and started "beating him up." *Id.* at 242. Not only did George not fight back, he "was passed out" and "wasn't even awake." *Id.*

As Mr. Sumka started to walk towards George, Mr. Murphy told him to "stay out of it." *Id.* Mr. Murphy then turned around and went towards the still-prone George, while Mr. Long left George and hit Mr. Sumka in the face, knocking him to the ground. Once Mr. Sumka got back to his feet, he "took off . . . to get some help" and ran down the road away from the assault. *Id.* at 243.

Mr. Sumka did not go far, however; he soon returned to the scene because he "couldn't leave George." *Id.* When he arrived back at the vehicles, Kevin hit him in the face before Mr. Murphy intervened, instructing Kevin to leave Mr. Sumka alone. Mr. Murphy then threw a knife across the road. At that point, Mr. Sumka could see George lying in a ditch at the side of the road. Mr. Sumka went to check on him and heard George "gurgling." *Id.* at 245.

Before Mr. Sumka could attempt to help George, Mr. Murphy demanded that he leave with the trio; Mr. Sumka complied, getting into Mr. Murphy's truck, and Mr.

5

Murphy drove the group back to his trailer. There, Mr. Murphy ordered everyone to change their clothing and collected their bloody garments in a bag.

A short while later, the group went to Mr. Taylor's home. In front of Mr. Sumka, Mr. Long, and Kevin, Mr. Murphy told Mr. Taylor that he "killed George Jacobs," and "cut [George's] throat, [] stomped his head, cut his private areas off, and shoved them in [George's] mouth." *Id.* at 191. While Mr. Murphy was bragging about killing George, and cutting off "[h]is dick and his balls," Mr. Taylor noticed that Mr. Sumka looked "a little beat up" and was "ghostly pale" and "frightened." *Id.* at 191–93.

Mr. Murphy soon drove the group to Katherine's house, where he sent Kevin inside to bring out George Jr.—Katherine's partner and George's son. Mr. Murphy explained that they would do the "same thing" to George Jr. that they had done to his father. *Id.* at 250. Kevin went inside and woke up George Jr., but Katherine intervened before he could convince George Jr. to go outside. Once again, Katherine warned Mr. Murphy to leave her property before she called the police; he drove away with Mr. Sumka and Mr. Long, leaving Kevin behind. Mr. Murphy then dropped off Mr. Long at Mr. Long's girlfriend's home.

Now with only Mr. Sumka as his passenger, Mr. Murphy continued to his mother's house, where Patsy was staying. There, he got Patsy out of bed and told her that "he killed George Jacobs, and that he sliced his throat, cut him in the stomach, and cut his nuts and dick off." *Id.* at 98. Mr. Murphy ended his boast by telling Patsy that George "won't fuck anyone anymore, not even you." *Id.* He then asked her if she would wash some bloody clothes for him. When she refused, he took a lighter and went outside.

6

Patsy soon saw flames in a nearby ditch where Mr. Murphy and his family members tossed their garbage: Mr. Sumka had helped Mr. Murphy to cut and then burn the bloody clothes in the ditch.

## 4

Mr. Murphy's actions quickly came to the attention of law enforcement officials. Early in the morning on August 29, 1999—a few hours after the attack—Agent John Jones of the Oklahoma State Bureau of Investigation ("OSBI") responded to a reported murder scene on Vernon Road. Upon his arrival, he found George's body lying alongside the roadway, near a ditch. George's pants and underwear had been pulled down around his knees. His car was parked on the road and his wallet, which allowed Agent Jones to identify him, was "directly in front of the vehicle." *Id.* at 134.

The severity of George's wounds was immediately apparent. He had deep cuts across his neck and his torso, and "[h]is penis and testicles had been removed." *Id.* at 136. Also, George's upper buttocks and lower back showed marks consistent with having been dragged across the gravel road.

After inspecting the crime scene, Agent Jones interviewed several witnesses and identified Mr. Murphy as a suspect. That same day, law enforcement officers brought Mr. Murphy to the local police station, where Agent Jones and another OSBI agent interviewed him about George's death. Though Mr. Murphy initially denied having seen George in three to four months, he eventually admitted to pulling in front of and blocking George's car, but claimed that Mr. Long and Kevin dragged George out onto the road. As the interview progressed, he told the agents that he kicked George in the testicles,

kicked him in the side, grabbed his hair, and cut his penis.  He also stated that he and the others left George at the side of the road, alive, after the attack.

On August 30, 1999, Dr. Ronald Distefano—a medical examiner employed by the state of Oklahoma—performed an autopsy on George's body.  He found that George had suffered several serious injuries: a cut to his larynx and jugular vein, which could have been fatal in and of itself; broken bones in his face; a thirteen-inch slice across the bottom of his chest; and the "complete[]" severing of his genitals by "a very sharp instrument." *Id.* at 324, 326.  Dr. Distefano determined that the death was a homicide, caused by the loss of blood resulting from the combined injuries inflicted on George.

**B**

**1**

Mr. Murphy was charged with George's murder and, in 2000, a jury in McIntosh County convicted him of first-degree murder.  The trial court imposed a death sentence.

Two decades later, in 2020, the Supreme Court announced its decision in *McGirt v. Oklahoma*, where it held that Congress had never disestablished the Muscogee (Creek) reservation in Eastern Oklahoma.  *See* 591 U.S. ----, 140 S. Ct. 2452, 2474 (2020).  Mr. Murphy was one of many criminal defendants originally prosecuted by the state of Oklahoma whose convictions were rendered infirm by the rationale articulated in *McGirt*.[4]  As a consequence of that decision, the murder scene

---

[4]     Mr. Murphy spent years seeking post-conviction relief at the state and federal levels.  In 2017, we overturned a federal district court's denial of Mr. Murphy's petition for post-conviction relief under 28 U.S.C. § 2254.  *See Murphy v. Royal*, 875 F.3d 896, 904 (10th Cir. 2017), *aff'd per curiam*, *Sharp v. Murphy*, 140 S.

on Vernon Road is now understood to be Indian Country, as defined by 18 U.S.C.

§ 1151, because it lies within the borders of the Muscogee reservation.[5] Mr. Murphy

is a member of the Muscogee Nation. Therefore, the task of prosecuting Mr. Murphy

fell to the federal government pursuant to the Major Crimes Act—which grants the

federal government exclusive jurisdiction over certain, enumerated crimes committed

by Indians in Indian country. *See* 18 U.S.C. § 1153(a).[6]

---

Ct. 2412 (2020) (mem.). We agreed with Mr. Murphy that his state conviction could not stand because Oklahoma did not have jurisdiction to prosecute him, as the murder was committed on the never-disestablished Muscogee reservation, and he was a member of the Muscogee Nation. *See id.* at 966. The same day that the Supreme Court released *McGirt v. Oklahoma* in 2020, the Court also affirmed our opinion in *Murphy* in a per curiam memorandum decision. *See Sharp v. Murphy*, 140 S. Ct. at 2412.

[5]    Title 18 U.S.C. § 1151 defines Indian country to be:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

[6]    Title 18 U.S.C. § 1153(a) provides, in relevant part:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder . . . [or] kidnapping, . . . shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

**2**

In September 2020—twenty years after Mr. Murphy's state conviction—a federal grand jury in the Eastern District of Oklahoma indicted him for murdering George and kidnapping George and Mr. Sumka. A month later, the grand jury returned a four-count superseding indictment against Mr. Murphy, charging him: in Count One with murdering George in violation of 18 U.S.C. §§ 1111(a), 1151, 1153, and 2; in Count Two with murdering George while perpetrating the kidnapping of Mr. Sumka and George, in violation of 18 U.S.C. §§ 1111(a), 1151, 1153, and 2; in Count Three with kidnapping George, resulting in his death, in violation of 18 U.S.C. §§ 1201(a)(2), 1151, 1153, and 2; and in Count Four with kidnapping Mr. Sumka, resulting in George's death, in violation of 18 U.S.C. §§ 1201(a)(2), 1151, 1153, and 2.

Following a three-day trial in August 2021, a jury convicted Mr. Murphy in Count One of the lesser-included charge of murder in the second degree and of the crimes charged in Counts Two and Three, but acquitted him of Count Four—that is, of kidnapping Mr. Sumka. Following the recommendation of the Probation Department in a Pre-Sentence Report ("PSR"), the district court imposed life sentences on each of the counts upon which Mr. Murphy was convicted—i.e., Counts One, Two, and Three—and ordered those sentences to be served concurrently.

**II**

Mr. Murphy timely filed this appeal and raises three separate challenges to his convictions. First, he argues that the evidence at trial was insufficient to sustain either of his kidnapping-related convictions—murdering George while kidnapping

10

him (Count Two), and kidnapping George, resulting in his death (Count Three).[7]

Second, Mr. Murphy contends that the applicable statute of limitations barred his

federal prosecution on each count of conviction.  Third, Mr. Murphy asserts that a

twenty-year period between George's murder and his indictment violated his Fifth

Amendment due process rights.

We begin our analysis with Mr. Murphy's challenge to his two kidnapping-

related convictions for Counts Two and Three, and we conclude that this challenge is

well-taken; his convictions on these counts cannot stand.  We then consider his

arguments regarding the applicable statute of limitations and the government's

allegedly unlawful delay in criminally charging him; we conclude that these

arguments are without merit and that the district court's rulings should not be

disturbed.

## A

Before considering the merits of Mr. Murphy's kidnapping-related argument, we

must first address the government's contention that he waived the specific sufficiency-of-

the-evidence challenge that he advances on appeal by not raising it before the district

court.  That position fails because Mr. Murphy advanced before the district court a broad

---

[7]　　Count Two of the superseding indictment charged Mr. Murphy with the murder of George resulting from the perpetration of the kidnappings of George and Mr. Sumka.  Both parties appear to accept the premise that, because Mr. Murphy was acquitted at trial on Count Four of the superseding indictment—i.e., the kidnapping of Mr. Sumka—his conviction on Count Two is therefore limited to the kidnapping of George.  We accept this premise as well.  As such, reversing Mr. Murphy's conviction on Count Three of kidnapping George will necessarily require reversing his conviction on Count Two.

sufficiency-of-the-evidence argument against the kidnapping-related counts, and, as a consequence, he is not foreclosed here from building on that argument through the articulation of specific theories. Those theories are preserved for our review.

**1**

Federal Rule of Criminal Procedure 29 allows defendants to challenge the sufficiency of the evidence presented against them both before submission to a jury and after the jury has returned a verdict. *See* FED. R. CRIM. P. 29.[8] "When a defendant

---

[8]    In pertinent part, the Rule provides:

(a) BEFORE SUBMISSION TO THE JURY. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

. . .

(c) AFTER JURY VERDICT OR DISCHARGE.

(1) *Time for a Motion.* A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.

(2) *Ruling on the Motion.* If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

(3) *No Prior Motion Required.* A defendant is not required to move for a judgment of acquittal before the court submits

12

challenges in district court the sufficiency of the evidence on specific grounds, 'all grounds not specified in the motion are waived.'" *United States v. Maynard*, 984 F.3d 948, 961 (10th Cir. 2020) (quoting *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007)). Notably, this rule does not require "specificity of grounds . . . in a Rule 29 motion." *Goode*, 483 F.3d at 681 (quoting *United States v. Dandy*, 998 F.2d 1344, 1356 (6th Cir. 1993)). Rather, it merely dictates that, "where a Rule 29 motion is made on specific grounds, all grounds not specified are waived." *Id.* (quoting *Dandy*, 998 F.2d at 1357); *see* 2A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 469 (4th ed.), Westlaw (database updated Apr. 2023) ("[I]f the defendant has asserted specific grounds in the trial court as the basis for a motion for acquittal, he or she cannot assert other grounds on appeal.").

## 2

At the close of the government's case, Mr. Murphy made an oral Rule 29 motion and, in relevant part, argued that "what happened to Mr. Jacobs did not amount to or constitute kidnapping. He's pulled out of the car, beaten and killed. *I don't think that that meets the elements of kidnapping*." R., Vol. III, at 336 (emphasis added). Focusing on Counts Two and Three, he contended:

> I don't think any rational juror could determine beyond a reasonable doubt that there was a kidnapping here by Mr. Murphy of George Jacobs. Because the testimony from Mr. Sumka was, is that, Mr. Jacobs was pulled out of the car and beaten and restrained

the case to the jury as a prerequisite for making such a motion after jury discharge.

FED. R. CRIM. P. 29(a), (c).

13

and detained by Mr. King and Mr. Long, not by Mr. Murphy. So to the extent that it could even be said there was a kidnapping of George Jacobs, it was not committed by Patrick Murphy according to their own witness. . . . As to Count Three, we move for a judgment of acquittal under Rule 29, because the evidence, as we argued before, does not indicate that Patrick Murphy, either by aiding and abetting or direct action kidnapped, if any kidnapping occurred, of George Jacobs. . . . Third element, the kidnapping of George Jacobs resulted in the death of George Jacobs. *There was no kidnapping, number one.* And second and more particularly, there was no kidnapping by Mr. Murphy.

*Id.* at 336–38 (emphasis added).

The government maintains that Mr. Murphy advances two arguments on appeal that he did not specifically raise before the district court, therefore waiving them. First, it asserts that Mr. Murphy has waived his claim that the kidnapping of George was indistinguishable from the murder. Second, and relatedly, it reasons that Mr. Murphy has waived the position that we should adopt a test set forth by the Third Circuit in *Government of the Virgin Islands v. Berry*, 604 F.2d 221, 227–28 (3d Cir. 1979), regarding the sufficiency of a kidnapping conviction, as he did not cite that case to the district court.

The government's procedural premises are correct. To be sure, while making his Rule 29 motion, Mr. Murphy did not specifically urge the district court to adopt the *Berry* test or to hold that the kidnapping of George was indistinguishable from his murder. However, we disagree with the government's conclusion that those omissions mean that Mr. Murphy has not preserved those arguments for our review.

Our precedent makes clear that defendants do not waive appellate review of discrete theories that build upon broad arguments made before the district court. In other

14

words, defendants do not waive specific theories by asserting broader, related arguments in the district court. *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 730 (10th Cir. 2016) ("Theories—as opposed to the overarching claims or legal rubrics that provide the foundation for them—are what matters.").

For example, in *United States v. Streett*, 83 F.4th 842 (10th Cir. 2023), we held that the defendant had preserved his challenge to a certain clause within 18 U.S.C. § 2251(a)—the statute that he was accused of violating—even though he had argued to the district court only that "§ 2251(a) [wa]s generally overbroad." *Id.* at 853. We concluded that, because the defendant presented to the district court a "fulsome," albeit "generalized version of the argument" that he later made on appeal, "it would have been obvious to the district court that the [specific] provision was at issue." *Id.* Thus, Mr. Streett had provided the district court with "ample opportunity to consider this issue thoroughly." *Id.*; *see also United States v. McIntosh*, 29 F.4th 648, 654–55 (10th Cir. 2022) (concluding that the defendant preserved his appellate challenge to the validity of his guilty plea because it was "substantially similar" to the challenge made before the district court, even though his appellate briefing was "more detailed" than his motion to withdraw his plea). As such, refining on appeal a broad insufficiency argument made before the district court does not run afoul of our preservation doctrine.

Here, Mr. Murphy made a "generalized" Rule 29 challenge to the kidnapping evidence against him, thereby giving the district court notice that all potential insufficiency arguments were in play vis-à-vis his kidnapping-related charges. *Streett*, 83 F.4th at 853. In his Rule 29 motion, he asserted that "what happened to [George] did not

15

amount to or constitute kidnapping.  He's pulled out of the car, beaten and killed.  I don't think that that meets the elements of kidnapping."  R., Vol. III, at 336.  But Mr. Murphy did not go beyond that: he did not identify discrete arguments (or theories) to support his position.  Consequently, he avoided effectively focusing the district court's decision-making on one specific theory, to the exclusion of other possible theories.  Accordingly, we conclude that Mr. Murphy did not fail to preserve the sufficiency-of-the-evidence arguments that he advances here.

In opposition to this view, the government draws our attention to a line of our precedent; however, that precedent is factually inapposite.  As that precedent suggests, we have consistently held that defendants waive sufficiency arguments when they make specific challenges in the district court in support of a Rule 29 motion and then later raise entirely separate claims before us.  Our preservation doctrine on this point is chiefly concerned with preventing defendants from raising for the first time on appeal entirely distinct arguments from those presented to the district court.  In this regard, the government relies on *Maynard* in making its waiver argument.  In *Maynard*, the defendant expressly limited the scope of his Rule 29 motion to one count in a multi-count prosecution.  *See* 984 F.3d at 961.  On appeal, however, he challenged the sufficiency of the evidence to support his convictions on several of the other counts, and we held that he waived those separate claims.  *See id.*

Similarly, in *Goode*, the defendant made a Rule 29 motion and maintained only that there was not a sufficient "legal nexus . . . between the weapon and [himself] to meet the element of possession."  483 F.3d at 681 (alteration in original).  We therefore held

16

that he forfeited before the district court the claim he later raised on appeal that the government failed to prove that the weapon moved through interstate or foreign commerce; accordingly, we reviewed his new challenge only for plain error and affirmed his conviction. *See id.* at 681–82. We made the same distinction again in *United States v. Leffler*, 942 F.3d 1192 (10th Cir. 2019), where we concluded that a defendant had waived the argument that the government failed to "establish the requisite nexus between the [firearm] and drug trafficking" after he had argued to the district court only that the government failed to prove that the firearm was "readily available to fire." *Id.* at 1197; *cf. United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003) (reviewing the defendant's sufficiency challenge for plain error because he raised a new argument on appeal after articulating only an interstate commerce challenge in his Rule 29 motion before the district court).

As our review should reveal, these authorities are inapposite. Unlike those defendants, Mr. Murphy avoided effectively focusing the district court's decision-making on one specific theory, to the exclusion of other possible theories. In other words, unlike those defendants, Mr. Murphy did not advance for the trial court's consideration specific theories for relief and then attempt to raise in seeking reversal before us other distinct theories. For example, Mr. Murphy is not challenging a different element of the indictment against him like the defendant in *Goode*, *see* 483 F.3d at 681, nor is he introducing a new constitutional argument like the defendant in *Kimler*, *see* 335 F.3d at 1141. Instead, on appeal he is building upon a broad challenge to the insufficiency of one element of the charged conduct. Because he did not articulate any specific theories—but

17

rather a broad general argument—before the district court as to the insufficiency of the kidnapping evidence, he may raise his discrete, specific theories of insufficiency as to that same element on appeal. We therefore turn to address the merits of his arguments.

**III**

**A**

**1**

We review de novo a district court's decision to deny a defendant's motion for acquittal under Rule 29. *See United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014). "We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *Id.* (quoting *United States v. White*, 673 F.2d 299, 301–02 (10th Cir. 1982)). "Our review is very deferential; we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged." *United States v. Gabaldon*, 389 F.3d 1090, 1094 (10th Cir. 2004).

**2**

Title 18 U.S.C. § 1201 sets forth the following elements for a kidnapping:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and *holds* for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—
>
> . . . .

18

> > (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
>
> > . . . .
>
> > > shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a)(2) (emphasis added).  The territorial jurisdiction of the United States includes Indian Country.  *See, e.g.*, 18 U.S.C. § 1151.  As we have explained, once the jurisdictional requirements are met—here, that an Indian defendant committed the offense in Indian Country—the crime of kidnapping is complete "upon the unlawful seizing and detention of the victim."  *United States v. Toledo*, 985 F.2d 1462, 1466 (10th Cir. 1993).

**B**

**1**

This case calls upon us to decide an unsettled question in this circuit: whether the statutory requirement of "hold[ing]" in § 1201 contains a temporal limitation. We hold that it does.  As we explain, to sustain a kidnapping conviction under § 1201, the government must offer evidence showing that the defendant held the victim for an appreciable period of time.  Though we refrain from defining the exact contours of that period here, it must be more than coterminous with the time necessary to carry out any related offense.  This is an especially critical point to underscore in circumstances like this one, where a defendant is charged with other

19

crimes that can involve some form of holding, such as murder, sexual assault, or robbery.

**2**

We have not had reason to definitively address the meaning of "holds" under § 1201. However, the Supreme Court has considered the issue, and its reasoning shapes our holding here. The Court first interpreted the federal kidnapping statute[9] in 1946 in *Chatwin v. United States*, 326 U.S. 455 (1946), in the context of a kidnapping prosecution of a man who convinced a fifteen-year-old girl to join him in traveling from Utah to Mexico, where they married before returning to Utah. Though their journey and marriage were "without the consent and against the wishes of [the girl's] parents," the Court found that the defendant did not hold the girl against her will, as she was free to leave at any time. *Id.* at 458–60. The defendant's conduct may have been "unattractive or immoral," the Court reasoned, but it "lack[ed] the characteristics of true kidnap[p]ings." *Id.* at 464. And the Court said there was no "indication that Congress desired or contemplated that the punishment of death or long imprisonment, as authorized by the [kidnapping] Act, might be applied to those guilty of immoralities lacking the characteristics of true kidnap[p]ings." *Id.* Accordingly, the Court unanimously reversed the kidnapping convictions of the defendant and his two accomplices because the government "failed to prove an act of unlawful restraint." *Id.* at 460.

---

[9] The statute at issue in *Chatwin* was 18 U.S.C. § 408a (1940), a predecessor to § 1201.

The Court's approach in *Chatwin* is instructive. A central purpose underlying its holding was to avoid a "careless" reading of the "broad" language of § 1201, which would improperly expand the statute to cover acts beyond "true kidnap[p]ings." *Id.* at 464. The Court stated the matter this way: "Were we to sanction a careless concept of the crime of kidnap[p]ing . . . the boundaries of potential liability would be lost in infinity." *Id.* More specifically, the Court said that "[a] loose construction of the statutory language conceivably could" result in "unfair punishment" by imposing stringent kidnapping penalties on less severe misconduct. *Id.* at 464–65. The Court determined that such a construction should be "foreclose[d]." *Id.* at 465.

This reasoning was reflected in the Court's narrowly tailored view of the statute. The Court observed that "seizure and detention [are] the very essence of the crime of kidnap[p]ing." *Id.* at 464. Thus, "[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for *an appreciable period* against the person's will and with a willful intent so to confine the victim." *Id.* at 460 (emphasis added). But the Court did not define what amount of time constituted "an appreciable period," leaving that question to be resolved by lower courts. *Id.*

*Chatwin* leaves us with a crucial limiting principle: courts must cabin § 1201 so as not to unfairly expand its breadth to reach offenses that do not inherently possess the characteristics of kidnapping. The "appreciable period" of holding inherent in a kidnapping is a key component of that principle. *Id.* Without it, any act

21

of holding—however incidental—committed in connection with other criminal conduct could transform that other conduct into the distinct offense of kidnapping, and subject the perpetrator to the severe punishment imposed by the kidnapping statute.

### 3

Several of our sister circuits have applied the limiting principle of *Chatwin* when interpreting the "hold[ing]" provision of § 1201 and similar statutes. In *Berry*, the Third Circuit examined a statute of the U.S. Virgin Islands that mirrored § 1201 in all pertinent aspects[10] and, after acknowledging *Chatwin*'s warning against "overly literal interpretation[s]" of kidnapping statutes, overturned the defendants' kidnapping convictions on the grounds that the victim's confinement had been purely incidental to the related robbery. 604 F.2d at 226–28. Therefore, that confinement did not amount to an independent confinement that could justify a kidnapping conviction. *See id.* at 227. To avoid the "principal danger" of a literal reading of the broad territorial kidnapping statute, the court formulated a four-factor test for

---

[10]    In relevant part, the statute provided:

> (a) Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from any person or entity any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of kidnapping for ransom and shall be imprisoned for life.

14 V.I.C. § 1052 (1978).

distinguishing crimes for which kidnapping charges are appropriate from those where they are not. *Id.* at 226. It listed the following factors: "(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *Id.* at 227. In assembling those factors, the Third Circuit extensively referenced state courts' interpretations of state kidnapping statutes. *See id.* at 226–27.

We discussed the *Berry* test in *Gabaldon*. *See* 389 F.3d at 1096–97. As with this case, *Gabaldon* involved a kidnapping and murder in Indian Country charged under § 1201(a)(2). *See id.* at 1094. The defendant relied on the *Berry* test in arguing "that the evidence at trial failed to show that [the victim's] confinement was anything more than a merely incidental part of her murder." *Id.* at 1096. We recognized that "[o]ur Circuit ha[d] yet to take a position either adopting or rejecting the *Berry* test." *Id.* at 1097. And we saw no reason to speak on the matter there because "the evidence clearly established kidnapping as a separate crime *even if we were to adopt the Berry test*"—that is, even if we were to assume without deciding that the *Berry* test applied. *Id.* (emphasis added). Indeed, the defendant "concede[d] that he held [the victim] longer than would have been minimally necessary for her to be murdered." *Id.* at 1098. As such, the defendant fatally undercut the central assertion upon which he looked to *Berry* for support—that is, his contention that "the

evidence at trial failed to show that [the victim's] confinement was anything more than a merely incidental part of her murder." *Id.* at 1096. Thus, we rejected the defendant's sufficiency-of-the-evidence challenge to his kidnapping conviction. *See id.* at 1098. We still have not taken a controlling position regarding the *Berry* test.

Among those circuits that have spoken with greater definitiveness, the Ninth and Eleventh Circuits have endorsed the Third Circuit's *Berry* test, but others have taken different approaches while still limiting the application of § 1201 to conduct that includes an act of holding that goes beyond any holding that was purely incidental to another criminal offense. *Compare United States v. Howard*, 918 F.2d 1529, 1536–37 (11th Cir. 1990) ("[a]dopting the *Berry* test"), *and United States v. Jackson*, 24 F.4th 1308, 1314 (9th Cir. 2022) (same),[11] *with United States v. Peden*, 961 F.2d 517, 522 (5th Cir. 1992) (declining to take a position on the *Berry* test and upholding a kidnapping conviction because the "asportation and detention went beyond that necessarily inherent in rape"), *and United States v. Krivoi*, 80 F.4th 142, 153–54 (2d Cir. 2023) (adopting a "narrowing gloss" on § 1201, instead of the *Berry* test, and requiring that the period of detention "must itself be appreciably longer than

---

[11]    Considering a defendant's challenge to his attempted kidnapping conviction, the Sixth Circuit noted that the logic of *Chatwin* and the Ninth Circuit's decision in *Jackson* "is not without force," and expressed concern that a "liberal conception of the holding element [of § 1201(a)] not only creates sweeping criminal liability such that virtually any crime involving contact with the person of another could be charged as a kidnapping, but it also strains the text." *United States v. Ferguson*, 65 F.4th 806, 812 (6th Cir. 2023). But it refrained from conclusively interpreting the holding element of the statute because the defendant had not taken a substantial step towards commission of the crime; the failure of proof as to that element alone necessitated reversal of his attempted kidnapping conviction. *See id.*

the time the defendant needed to commit only the other crime or crimes with which he or she has been charged" and then upholding the defendant's kidnapping conviction under that formulation).

Regardless of the exact doctrinal path of those cases that have definitively opined on the matter, the unifying theme across those decisions is the recognition that—without the limiting requirement of an appreciable temporal period—a literal interpretation of "hold[]" under § 1201 and analogous statutes would unfairly sweep up criminal conduct far beyond actual kidnappings and expose such conduct to the severe penalties associated with the crime of kidnapping. More specifically, these courts have sought to preserve the distinctive nature of kidnapping by interpreting the offense to require an appreciable temporal period of detention (i.e., holding) beyond that inherent in the commission of another offense.

We endorse this unifying theme, which interprets the scope of § 1201 as requiring an appreciable temporal period of detention (i.e., holding) beyond that necessary to commit any other offense. In doing so, we read the statute in a manner that faithfully embodies the concerns of *Chatwin* and does not embellish or contravene the statute's plain terms. We deem this approach to be analytically sufficient and have no need or inclination to rely on the *Berry* test.[12]

---

[12]    To be sure, Mr. Murphy urges us to adopt the *Berry* test. We are not persuaded of the necessity or wisdom of doing so. The Court's analysis in *Chatwin* offers clear interpretive guidance regarding the scope of § 1201, and we believe that the prudent course is to address questions regarding whether offenses fit within the scope of that statute by applying *Chatwin*'s guidance to the factual circumstances of particular cases. More specifically, we see no direct nexus between the *Berry* test

**4**

The government expressly resists any interpretation of the statutory "hold[ing]" requirement that includes a temporal limitation. Without recognizing the weight of extra-circuit decisions to the contrary, the government urges us to refuse to add a "time requirement" to the holding element within § 1201, because such a requirement is "not within the plain language" of the statute. Aplee.'s Resp. Br. at 23.[13] Therefore, the government says that requiring an appreciable period of holding

---

and the statute's terms and, in light of *Chatwin*'s guidance, we do not believe that *Berry*'s gloss on the statute furthers our understanding of the statute's proscriptive scope. In *Gabaldon*, we noted that the *Berry* test had "not been widely adopted by other Circuits," and that remains true today. 389 F.3d at 1097. Admittedly, we also observed in *Gabaldon* that there was "much in the *Berry* test to commend its use in a § 1201(a)(2) situation." *Id.* But we did not adopt the *Berry* test, and thus this commendation cannot be deemed more than dicta and certainly has no compelling or controlling force here. Indeed, perhaps due to the defendant's virtually dispositive concession regarding the length of his detention, the panel in *Gabaldon* did not examine the import of *Chatwin* but, instead, found that assuming that the *Berry* test applies supplied a ready and efficient ground for resolving the defendant's sufficiency challenge. *See id.* However, here—where Mr. Murphy does not make a similar concession—we have examined *Chatwin*'s import and conclude that *Chatwin* provides clear and sufficient interpretive guidance regarding the scope of § 1201. Therefore, unlike *Gabaldon*, we decline to even assume that the *Berry* test applies here. All that said, Mr. Murphy cannot reasonably claim that he is prejudiced by our decision to reject his request that we apply the *Berry* test because even under our less-formulaic approach, centered on *Chatwin*, we conclude that his kidnapping-related convictions cannot stand.

[13]     The Second Circuit published *Krivoi* after oral argument took place here. In a notice of supplemental authority filed pursuant to Federal Rule of Appellate Procedure 28(j), the government urges us to consider *Krivoi*. However, that case bolsters our holding here. Though the Second Circuit upheld the defendant's kidnapping conviction, the facts there are easily distinguishable and support the doctrinal unifying theme of an appreciable period of holding that both we and the Second Circuit have emphasized. The defendant in *Krivoi* detained the victim for roughly thirty minutes while assisting a co-defendant in extorting him, and

would "make[] meaningless a plain and ordinary reading of the statute."  *Id.*

According to the government, the evidence presented to the jury—that Mr. Murphy

"intercepted George's travels on a public roadway, ran off George's only means of

escape, pulled George out of the car, and killed George"—is sufficient to establish

that he seized and held, and thus kidnapped, George under § 1201.  *Id.*

In support of its position, the government points to a District of Columbia

Court of Appeals case,[14] *Ruffin v. United States*, 219 A.3d 997, 1006 (D.C. 2019).  In

*Ruffin*, the defendant was convicted of kidnapping under the District of Columbia

kidnapping statute, which mirrors the language of § 1201,[15] after he ambushed a

woman in her apartment complex, held a knife to her face, told her not to move,

---

driving him to several locations in the process.  *See* 80 F.4th at 147–48.  In stark
contrast, as discussed *infra*, Mr. Murphy fatally attacked George within minutes after
encountering him and Mr. Sumka on Vernon Road.

[14]    The District of Columbia Court of Appeals is the highest local court of
the District of Columbia.  *See, e.g.*, *M. A. P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971)
("As this court on February 1, 1971 became the highest court of the District of
Columbia, no longer subject to review by the United States Court of Appeals, we are
not bound by the decisions of the United States Court of Appeals rendered after that
date.").

[15]    In relevant part, the District of Columbia statute provided:

> Whoever shall be guilty of, or of aiding or abetting in, seizing,
> confining, inveigling, enticing, decoying, kidnapping, abducting,
> concealing, or carrying away any individual by any means
> whatsoever, and holding or detaining, or with the intent to hold or
> detain, such individual for ransom or reward or otherwise . . . shall,
> upon conviction thereof, be punished by imprisonment for not
> more than 30 years.

D.C. Code § 22-2001 (2019 Supp.).

pushed her into a common area, demanded money, and sexually assaulted her. *See* 219 A.3d at 1000–01. On appeal, the defendant argued that "there was insufficient evidence to sustain his kidnapping conviction because [the victim's] detention lasted only about a minute-and-a-half and was 'incidental' to and 'wholly coextensive with' the assault and attempted robbery." *Id.* at 1005.

Affirming the defendant's conviction, the court ruled that his argument was "'foreclosed' by 'binding precedent.'" *Id.* (quoting *Richardson v. United States*, 116 A.3d 434, 438 (D.C. 2015)). Rather than engaging with the defendant's argument, the court noted that it had previously denied similar challenges to the District of Columbia kidnapping statute. *See id.* at 1005–06. Previously, in *Richardson*, the court held that the plain statutory language contained "no exception for cases in which the conduct underlying the kidnapping is momentary or incidental to another offense." 116 A.3d at 439. As that court made clear in *Ruffin*, *Richardson*, and its other related precedents, the District of Columbia Court of Appeals has long understood the statute to contain "no requirement that the victim be moved any particular distance or be held for any particular length of time to constitute a kidnapping; all that is required is a 'seizing, confining' or the like and a 'holding or detaining' for ransom or reward 'or otherwise.'" *Id.* (quoting *West v. United States*, 599 A.2d 788, 793 n.9 (D.C. 1991), *partially abrogated on other grounds by Byrd v. United States*, 598 A.2d 386 (D.C. 1991) (en banc)).

Embracing a literal interpretation of § 1201 like that in *Ruffin*, the government contends that we should sustain Mr. Murphy's kidnapping-related convictions here.

28

We reject the government's position. We need not dwell on the obvious point: decisions of the District of Columbia Court of Appeals are not binding on us. Moreover, accepting *Ruffin*'s proposed reading of § 1201 would result in exactly the sort of "careless concept of the crime of kidnap[p]ing" that the Court warned against in *Chatwin*. 326 U.S. at 464. Such a holding would also go against the clear evolution of the law on this question. Indeed, our fellow circuits have consistently decided to narrow the scope of liability under § 1201—*not* to expand it.

Further, unlike other courts analyzing § 1201 or statutes that mirror it, *see Berry*, 604 F.2d at 226; *Krivoi*, 80 F.4th at 152–54, the District of Columbia Court of Appeals has not engaged with *Chatwin* nor the Court's underlying concerns of excessive prosecution enabled by an overly-broad definition of "kidnapping." *See Ruffin*, 219 A.3d at 1005–06; *Richardson*, 116 A.3d at 438–41. Because the District of Columbia Court of Appeals's caselaw has elided that substantive analysis, those precedents are not convincing, and we decline to adopt their reasoning.[16]

---

[16]    Also, a recent opinion of the District of Columbia Court of Appeals and the related rehearing proceedings regarding it have called that court's prior cases regarding the holding element into question. In *Cardozo v. United States*, the defendant challenged his kidnapping conviction on the grounds that he committed only a "transitory" holding that was "coextensive with and incidental to" the related sexual assault. 255 A.3d 979, 982–83 (D.C. 2021), *vacated pending rehearing en banc*, 268 A.3d 862 (D.C. 2022) (mem.). The court again rejected this argument as barred by its precedents and, though it briefly acknowledged that language in *Chatwin* "support[ed]" the defendant's argument, it considered that discussion to be dicta. *Id.* at 982–83.

Concurring, Judge Deahl agreed that the court's holding was required under its precedents, *but* maintained that this doctrine "embrace[s] an indefensible reading of the kidnapping statute [that] is an absurdity of [the court's] own invention." *Id.* at

Lastly, in rejecting the government's position, we note that even acknowledging that the "appreciable period" language in *Chatwin* is dicta, rather than an express holding, does not affect our analysis here. *See United States v. Booker*, 63 F.4th 1254, 1260 n.3 (10th Cir. 2023) ("This court considers itself bound by dicta from the Supreme Court almost as firmly as we are by its holdings."). The *Chatwin* Court's overarching interpretive guidance was clear, and we refuse to endorse the government's contrary, proposed interpretation of § 1201. A literal reading of the statute would render "the boundaries of potential liability . . . lost in infinity," *Chatwin*, 326 U.S. at 464, and we join our sister circuits in rejecting that outcome.

## C

Thus, guided by *Chatwin*, we interpret the scope of § 1201 as requiring an appreciable period of detention (i.e., holding) beyond that necessary to commit any other offense. Applying this standard here, we conclude that the government did not present sufficient evidence such that any reasonable juror could find beyond a reasonable doubt that Mr. Murphy held George for any appreciable period beyond the time necessary to effectuate his murder. Accordingly, the government failed to prove

---

988 (Deahl, J., concurring). Among several other critiques, he emphasized that the court had not engaged with *Chatwin*'s "[g]uidance" in its previous cases. *Id.* at 990. The full court subsequently vacated its opinion in *Cardozo* pending rehearing. *See* 255 A.3d at 862. So, looking beyond the analytical weaknesses of the line of cases from the District of Columbia Court of Appeals that the government urges us to adopt, it appears that the District of Columbia Court of Appeals itself is questioning its views regarding the holding requirement of kidnapping.

a requisite element (i.e., holding) of its kidnapping-related charges, and we must reverse Mr. Murphy's convictions on those charges.

Even viewing the facts in the light most favorable to the government, *see Fuller*, 751 F.3d at 1153, any holding of George was only incidental to his murder. Mr. Sumka's testimony indicates that a very short amount of time passed between Mr. Murphy forcing the car that Mr. Sumka was driving to stop, and George being pulled from the car. By the time Mr. Sumka had parked and exited the driver's seat, Mr. Long and Kevin had already pulled George from the car and begun assaulting him. The record does not indicate—nor does the government suggest—that there was any appreciable period of delay between the time George was dragged from the car and the time that the three men, including Mr. Murphy, began assaulting him.[17]

---

[17]    For purposes of contending that he did not hold George for an appreciable period, Mr. Murphy makes no effort in his briefing to draw a legal distinction—that is, to distinguish as a matter of law—between his conduct and that of his two accomplices. *See* Aplt.'s Opening Br. at 18–19 ("As soon as [George] was forcibly removed from the automobile, he was beaten by Kevin King and Billy Jack Long. In short order, *regardless of who inflicted the injuries*, [George's] throat and abdomen were cut, his penis and testicles were excised, and he expired in a ditch at the side of the road. There was an uninterrupted series of events which quickly culminated in [George's] murder. *The seizure of [George] from the car and the events that followed* were temporally no longer than necessary to accomplish the objective of murder." (emphases added)). Nor does the government. Indeed, the government contends that Mr. Murphy has abandoned on appeal any claim that he was not criminally liable—at least under an aiding and abetting theory—for the actions resulting in the death of George, even if he did not personally do them. *See* Aplee.'s Resp. Br. at 22–23 n.7 ("Defendant has abandoned any claim on appeal that he did not, at a minimum, aid and abet the actual kidnapping—no matter which of the three actually pulled George from the car."). Mr. Murphy does not dispute this claim of abandonment in his Reply Brief, which is consistent with his failure to distinguish between his conduct and that of the other two men. *Cf. Eaton v. Pacheco*, 931 F.3d 1009, 1031 (10th Cir. 2019) (noting, as to the lack of a response in a reply brief, that

Though Mr. Murphy first approached Mr. Sumka after he exited the car and told him to "stay out of it," that interaction could not have lasted more than a few seconds, as Mr. Murphy promptly went to the back of the car—where George was lying prone on the road.  R., Vol. III, at 242.

Mr. Sumka went to look for help, but soon returned because he "couldn't leave George."  *Id.* at 243.  By the time he returned, George was in the ditch by the side of the road, "gurgling" and unable to speak, and dying from his wounds.  *Id.* at 245. Though Mr. Murphy boasted that he personally stabbed and dismembered George resulting in his death, the government offered no proof that Mr. Murphy somehow personally held George for an appreciable period apart from the time necessary to commit the acts that killed him.  Nor did the government establish that he aided and abetted his two accomplices in holding him for such an appreciable period.  Indeed, the government would have been hard pressed to make such a showing on this record—which suggests that the time between Mr. Sumka being forced to park on Vernon Road and George bleeding out in the ditch was only a matter of minutes.

Aside from its threshold legal argument that the addition of a "time requirement to . . . the holding element" is misguided and contrary to the plain terms of the statute, Aplee.'s Resp. Br. at 23—which we have rejected here—the

---

we "treat any non-obvious responses he could have made as waived and assume the [government's] analysis is correct.").  Accordingly, ultimately, in assessing whether the time in which George was held could be viewed by a reasonable juror as appreciable, we look to the conduct of not only Mr. Murphy, but also Kevin and Mr. Long.

government offers nothing to counter our reasoning.  By its own description, Mr.

Murphy's holding of George was part and parcel of the actions he took to kill him.

*See id.* ("Defendant held George long enough to beat George, take down George's

pants, cut off George's penis, and slice George's neck and abdomen from side to

side.").  That is, the record demonstrates that there was no holding of George

separate from the actions necessary to pull him from the car, grievously assault him,

and drag him into the ditch where he died.  Furthermore, the fact that there was no

meaningful asportation—because the trio moved George only from the car to the road

and then into the ditch—weighs against a finding of an appreciable period of

holding.[18]

    Comparing the facts here to those in *Gabaldon* and cases in which other courts

have upheld kidnapping convictions, moreover, confirms our holding.  In *Gabaldon*,

the defendant conceded that he "held [the victim] longer than would have been

minimally necessary for her to be murdered," because he and the co-defendant "drove

around with [the victim] while 'deciding what to do with her.'"  389 F.3d at 1098.

The facts of *Krivoi* and *Peden* also clearly fall on the former side of the line between

---

[18]     Though Mr. Murphy was convicted of a form of federal kidnapping that does not have asportation as an element of the offense, *cf. United States v. Walker*, 137 F.3d 1217, 1220 (10th Cir. 1998) (noting as one element of the § 1201(a)(1) offense that there be "transportation in interstate commerce"), the fact that there was no meaningful asportation here bears on the question of whether George was held for an appreciable period apart from the time necessary to kill him, *cf. Gabaldon*, 389 F.3d at 1098 (noting, in finding the appreciable period requirement satisfied, that the defendant "acknowledged in his appellate brief that they drove around with [the victim] while 'deciding what to do with her'").

an appreciable holding and a detention incidental to the commission of another crime. The defendant in *Krivoi* drove the victim to several different locations over the course of thirty minutes, assaulting him at one before taking him back to the restaurant where they originally met. *See* 80 F.4th at 146–48. As for *Peden*, the defendant there convinced the fifteen-year-old victim to leave a skating rink with him, ostensibly to buy food, only to take her to a different location and rape her. *See* 961 F.2d at 519. These cases illustrate the types of fact patterns that can sustain kidnapping convictions where the defendant commits another violent crime: a holding for an appreciable period of time separate from whatever holding is necessary to commit the accompanying violent crime.

***

We conclude that Mr. Murphy did not hold George for an appreciable period beyond the time necessary to kill him. Any holding of George was entirely "inconsequential and [an] inherent side-effect of h[is] murder." *Gabaldon*, 389 F.3d at 1098. Consequently, in our view, no reasonable juror could conclude that Mr. Murphy kidnapped George. *See id.* at 1094.

We therefore agree with Mr. Murphy that his convictions on Counts Two and Three cannot stand. However, we now address Mr. Murphy's other arguments for reversal, and, after careful study, we reject them.

IV

Mr. Murphy next contends that the district court erred in denying his motion to dismiss on statute-of-limitations grounds. As he does on appeal, Mr. Murphy argued

34

before the district court that the charges against him required dismissal because he was indicted long after the expiration of the general five-year statute of limitations applicable to most non-capital offenses.  Mr. Murphy's challenge presents an issue of first impression concerning the applicable statute of limitations for prosecutions that involve capital offenses—when assessed under the plain terms of the governing statutes—but nevertheless do not authorize the imposition of the death penalty because the crimes at issue occurred in certain parts of Indian Country.

We reject Mr. Murphy's statute-of-limitations challenge and accordingly uphold the district court's denial of his motion to dismiss.

**A**

We review de novo a district court's determination that a litigant's claims are not barred by the statute of limitations.  *See Fulghum v. Embarq Corp.*, 785 F.3d 395, 413 (10th Cir. 2015).

**B**

After his indictment, Mr. Murphy filed a motion to dismiss all of the charges against him because the grand jury returned the indictment over a decade after the expiration of the statute of limitations contained in 18 U.S.C. § 3282, which prohibits charging a defendant with any non-capital offense more than five years after the offense has been committed, "[e]xcept as otherwise expressly provided by law."  18 U.S.C. § 3282(a).  Generally, the four charges in the indictment against Mr. Murphy—murder in Indian country; murder in Indian country in perpetration of a kidnapping; and two counts of kidnapping resulting in death—carry a maximum

35

penalty of death under federal law. *See* 18 U.S.C. §§ 1111(b), 1201(a). No statute of limitations applies to offenses punishable by death. *See* 18 U.S.C. § 3281 ("An indictment for any offense punishable by death may be found at any time without limitation."). Nevertheless, Mr. Murphy contended that the offenses with which he was charged were not punishable by death because the Muscogee Nation has not adopted the death penalty as a form of punishment. Therefore, as Mr. Murphy reasoned, the general five-year statute of limitations applied to his offenses. And, because the federal grand jury indicted him two decades after George's murder, Mr. Murphy argued that the statute of limitations had run.

The district court issued a written order denying Mr. Murphy's motion on February 18, 2021. Though finding Mr. Murphy's position to be "both understandable and rational," the district court concluded that "[t]he death penalty's unavailability due to a jurisdictional quirk does not, and cannot, affect the statute of limitations for charging the offense." R., Vol. I, at 244, 246 (Order Den. Mot. to Dismiss Under Statute of Limitations, filed Feb. 18, 2021).

On appeal, Mr. Murphy largely repeats the argument that he made to the district court. Specifically, he contends that the reference in § 3281 to "[a]n indictment for any offense punishable by death," "refer[s] to a specific instrument filed against a specific individual." Aplt.'s Opening Br. at 26. And, notably, a defendant within Indian country is not subject to a capital sentence unless the tribe on whose land the offense occurred has elected to have the federal death penalty applied

36

to crimes on its lands. *See* 18 U.S.C. § 3598.[19]  Because the Muscogee Nation has not adopted the death penalty as a form of punishment, Mr. Murphy correctly posits that he was not eligible to receive the death penalty for his four charged offenses. And, owing to the unavailability of capital punishment, Mr. Murphy argues that the crimes charged in his specific indictment cannot be considered capital offenses that have no statute of limitations.

Thus, Mr. Murphy concludes that the five-year catchall statute of limitations applicable to non-capital federal crimes applies to his specific charges, which arose from conduct dating back to 1999.  *See* 18 U.S.C. § 3282 ("[N]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").  Because the government did not charge him until 2020, Mr. Murphy claims that the statute of limitations bars his prosecution.

---

[19]　　That statute provides:

> Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.

Title 18 U.S.C. § 3598.

## C

### 1

The district court properly rejected Mr. Murphy's statute-of-limitations argument.  First, Mr. Murphy maintains that the "plain and unambiguous language" of § 3281 demands that we reverse the district court's order, but his reading of the statutory text is incorrect.  Aplt.'s Opening Br. at 26.  In interpreting statutes, we aim to understand the "ordinary meaning" of their words.  *Kemp v. United States*, 596 U.S. 528, 534 (2022).  Importantly, however, "we [do not] read the text divorced from its statutory scheme."  *United States v. Garcia*, 74 F.4th 1073, 1124 (10th Cir. 2023); *accord Niz-Chavez v. Garland*, 593 U.S. 155, 165 (2021) (acknowledging that we may look to statutory structure to ascertain ordinary meaning).  Statutory captions are part of the statutory scheme and can serve as "'a useful aid in resolving' a statutory text's 'ambiguity.'"  *United States v. Quality Stores, Inc.*, 572 U.S. 141, 150 (2014) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388–89 (1959)).  Both the ordinary meaning of § 3281's plain terms, as well as the broader statutory scheme, support the government's argument.

Section 3281 provides that "[a]n indictment for any offense punishable by death may be found at any time without limitation."  18 U.S.C. § 3281.  An offense is a "violation of the law."  *Offense*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Certainly, Mr. Murphy's charged offenses are, as a general matter, punishable by death.  *See* 18 U.S.C. § 1111(b) ("Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life."); 18 U.S.C. § 1201(a) ("[I]f

the death of any person results" from the violation of the federal kidnapping statute, the punishment "shall be . . . death or life imprisonment.").  That is, but for the specific jurisdictional implications of Mr. Murphy's Indian Country prosecution, his offenses under the relevant statutes would be punishable by death.  As such, an ordinary reader would interpret the combination of these three statutes—§§ 3281, 1111(b), and 1201(a)—as indicating that Mr. Murphy was charged with capital offenses even though a capital sentence was unavailable in his particular prosecution.

It is perhaps for this reason that Mr. Murphy urges us to interpret § 3281's inclusion of the words "[a]n indictment" to refer to a specific indictment in an individual prosecution, but that position is unavailing.  Mr. Murphy fails to cite any authority to support this reading of the statute, and the statute does not speak in terms of "a defendant's indictment," "a particular indictment," a "specific indictment," or even "the indictment."  Accepting Mr. Murphy's argument would require "reading additional language into the statute," which we are loath to do, especially when it would conflict with the statutory scheme and produce absurd results.  *Garcia*, 74 F.4th at 1124.

In any event, to the extent that § 3281's reference to "[a]n indictment" creates ambiguity in the statute, we may resolve that ambiguity by reference to the statutory caption.  *See Quality Stores, Inc.*, 572 U.S. at 150.  Specifically, § 3281 bears the heading "Capital [O]ffenses."  18 U.S.C. § 3281.  A "capital offense" is a "crime for which the death penalty may be imposed."  *Capital Offense*, BLACK'S LAW DICTIONARY (11th ed. 2019).  "[T]he word 'may' clearly connotes discretion."  *Opati*

*v. Republic of Sudan*, 590 U.S. 418, 428 (2020) (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016)).  Thus, the death penalty remains a viable choice at all points for the offenses specified in the statute if the tribes use their discretion to permit it.

Accordingly, Mr. Murphy's challenge, as a textual matter, is unavailing.  By reading the two statutes in concert with § 3281, we conclude that Congress exempted murder in the first degree and kidnapping resulting in death from the general five-year statute of limitations applicable to non-capital offenses.  In other words, as  a textual matter, these are capital offenses, and Congress did not contemplate that the five-year statute of limitations for non-capital offenses would apply to prosecutions involving them.  More specifically, the circumstances of a particular defendant's Indian Country prosecution under these statutes—where the tribe has outlawed the death penalty and declined to opt for its application—do not legally strip these offenses of their capital character.

**2**

Even if that textual analysis were not enough to doom Mr. Murphy's statute-of-limitations challenge—and it is—Mr. Murphy would struggle to prevail because, as he himself acknowledges, no caselaw supports his position.  *See* Aplt.'s Opening Br. at 24 ("Granted, this argument has failed to find much favor in the cases addressing it.").  This is an issue of first impression in our court, but persuasive authority counsels against adopting Mr. Murphy's position.  Notably, in *United States v. Gallaher*, 624 F.3d 934 (9th Cir. 2010), the Ninth Circuit considered this

question and concluded that the conditional elimination of the death penalty for the offense charged (murder on a Native American reservation) did not change the status of the crime as one "punishable by death" under federal law. *Id.* at 940–41. As the court explained, "whether a crime is 'punishable by death' under § 3281 or 'capital' under § 3282 depends on whether the death penalty may be imposed for the crime under the enabling statute, *not* 'on whether the death penalty is in fact available for defendants in a particular case.'" *Id.* at 940 (emphasis added) (quoting *United States v. Ealy*, 363 F.3d 292, 296–97 (4th Cir. 2004)). The court held that, because premeditated murder "is generally punishable by death under federal law," the Confederated Tribes' decision to prohibit capital punishment on the Colville Reservation did not remove the defendant's murder charge from the ambit of § 3281, and the district court correctly applied an unlimited statute of limitations. *Id.*

Similarly, in *United States v. Martinez*, 505 F. Supp. 2d 1024 (D.N.M. 2007), the defendant moved to dismiss the case against him on statute-of-limitations grounds, as he was facing federal murder charges under a superseding indictment that was filed more than five years after the Indian Country killing, and the tribe in question banned the imposition of the death penalty. *See id.* at 1025–26. The district court held that the defendant "improperly conflated the availability of a 'capital sentence' under 18 U.S.C. § 3598 with the definition of a 'capital offense,' and/or [] an 'offense punishable by death' under 18 U.S.C. § 3281" and that § 3598 "does not undermine the capital nature of first-degree murder as charged under 18 U.S.C. § 1111." *Id.* at 1031. Thus, it denied the defendant's motion.

41

We find both *Gallaher* and *Martinez* to be persuasive, and Mr. Murphy does not offer any authority to the contrary. Indeed, he cites only one case in support of his position: our decision in *United States v. Maestas*, 523 F.2d 316 (10th Cir. 1975). But *Maestas* is inapposite. There, we affirmed the district court's decision to supply the defendant with ten peremptory jury challenges, even though the government charged him with first degree murder under § 1111, and Federal Rule of Criminal Procedure 24(b)(1) authorizes twenty peremptory strikes for those charged with capital offenses. *See Maestas*, 523 F.2d at 318–19. We held that the defendant's "case lost its capital nature as charged in the indictment" when the government disclaimed any intention to seek the death penalty. *Id.* at 319. However, *Maestas* said nothing about the capital character of *the offenses*—murder and rape. *See id.* Rather, it spoke of the "capital nature" of the "*case*," i.e., the specific prosecution brought against Mr. Maestas. *Id.* (emphasis added).

By contrast, § 3281 speaks of capital "offenses"—the crimes enumerated via specific statutes. 18 U.S.C. § 3281. Moreover, the district court here correctly distinguished *Maestas* because it concerned Rule 24(b), which was "intended to provide greater protections to defendants in those cases where the Government specifically seeks a death sentence." R., Vol. I, at 245. Conversely, the district court appropriately determined that statutes "declaring certain offenses punishable by death reflect legislative judgments regarding the seriousness of the crime." *Id.*

\*\*\*

The district court properly observed that finding in Mr. Murphy's favor on this point would allow individuals otherwise guilty of murder and similarly severe capital offenses to "permanently escape justice simply because [the offenses occurred] on lands associated with a Native American tribe that objects to the death penalty." *Id.* at 246. In our view, such a loophole would be contrary to both the intent of Congress and the plain text of § 3281, and we decline to allow for it. Accordingly, we uphold the district court's denial of Mr. Murphy's motion to dismiss.

## V

Mr. Murphy argues that the district court erred in denying his motion to dismiss the indictment against him based on the twenty-year delay between George's murder and the filing of the federal indictment. We disagree.

### A

#### 1

We review the denial of a motion to dismiss for an abuse of discretion. *See United States v. Stevens*, 881 F.3d 1249, 1252 (10th Cir. 2018). And we have held that "'[a]n error of law is per se an abuse of discretion,' and we review legal questions de novo." *Id.* (citations omitted) (quoting *United States v. Lopez-Avila*, 665 F.3d 1216, 1219 (10th Cir. 2011)).

The Supreme Court has long understood that statutes of limitations "provide 'the primary guarantee[] against bringing overly stale criminal charges.'" *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (quoting *United States v. Marion*, 404

43

U.S. 307, 322 (1971)).  But those statutes do not "'fully define (defendants') rights with respect to the events occurring *prior to* indictment,' . . . [because] the Due Process Clause has a limited role to play in protecting against oppressive delay."  *Id.* (emphasis added) (quoting *Marion*, 404 U.S. at 324).

In *Lovasco*, the Supreme Court held that pre-indictment delay "solely 'to gain tactical advantage over the accused,' . . . deviat[es] from elementary standards of 'fair play and decency'" required by the Due Process Clause of the Fifth Amendment. *Id.* at 795 (quoting *Marion*, 404 U.S. at 324).  The Court thus highlighted that actual prejudice resulting from pre-indictment delay, standing alone, will not be enough to violate the defendant's due process rights.  *See id.* at 796.  Instead, "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."  *Id.* at 790.  Thus, "proof of actual prejudice makes a due process claim concrete and ripe for adjudication," but it does not render the claim "automatically valid."  *Id.* at 789.  Moreover, actual prejudice caused by only "investigative delay" on the part of the government does not create a due process violation; instead, the Court indicated that delay for the purpose of gaining "tactical advantage over the accused" would support a violation.  *Id.* at 795–96 (quoting *Marion*, 404 U.S. at 324).

Rather than "determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions," the Court left to "lower

courts, in the first instance, the task of applying the settled principles of due process

. . . to the particular circumstances of individual cases." *Id.* at 796–97.

**2**

We have "understood the Supreme Court to have 'establish[ed] a two-pronged

due process test against which to measure pre-indictment delay' requiring (1) 'a

showing of actual prejudice resulting from the preindictment delay' and (2) 'that the

delay was purposefully designed to gain tactical advantage or to harass the

defendants.'" *Garcia*, 74 F.4th at 1096 (alteration in original) (quoting *United States*

*v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978)).  Under this test, prejudice is

necessary but not sufficient to establish a due process violation.  *See Lovasco*, 431

U.S. at 790; *see also* 5 Wayne R. LaFave et al., CRIMINAL PROCEDURE § 18.5(b) (4th

ed.), Westlaw (database updated Dec. 2023).

As understood by the lower courts, including but not limited to our own, under

the *Lovasco* criteria it is "extremely difficult for a defendant to prevail" on a claim

that the government's pre-indictment delay violated his due process rights.  5

LaFave, *supra*, § 18.5(b); *see also United States v. Mitchell*, 558 F. App'x 831, 833

(10th Cir. 2014) ("These deeply restrictive criteria are a natural consequence of the

prosecutor's wide discretion to decide when to bring charges.").  Thus, we have held

that the identified delay must prejudice the defendant's "substantial rights," and the

defendant's claims of prejudice must be "definite," not "speculative" or "[v]ague and

conclusory." *Garcia*, 74 F.4th at 1097, 1099 (quoting *United States v. Colonna*, 360

F.3d 1169, 1177 (10th Cir. 2004), *overruled on other grounds by Henderson v.*

*United States*, 575 U.S. 622 (2015)); *see also United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006) ("Vague and conclusory allegations of prejudice resulting from the passage of time and absence of witnesses are insufficient to constitute a showing of actual prejudice." (quoting *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998))).  And the length of the delay, without more, is insufficient to establish actual prejudice.  *See Garcia*, 74 F.4th at 1100–01; *see also United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992) (concluding that a five-year delay between the offense and the indictment did not demonstrate actual prejudice); *cf. Lovasco*, 431 U.S. at 796 (holding that investigative delay alone does not create actual prejudice, "even if [the defendant's] defense might have been somewhat prejudiced by the lapse of time").

"[G]enerally," actual prejudice in the pre-indictment delay context "take[s] the form of either a loss of witnesses and/or physical evidence or the impairment of their effective use at trial."  *Garcia*, 74 F.4th at 1103 (second alteration in original) (quoting *United States v. Comosona*, 614 F.2d 695, 696 (10th Cir. 1980)).  But it is not enough that the evidence has been lost or impaired; rather, the defendant must show that the loss of the particular evidence actually prejudiced the defense.  *See id.*; *see also United States v. Wood*, 207 F.3d 1222, 1235 (10th Cir. 2000) (finding that the defendant's claim of pre-indictment delay was too vague and conclusory despite the fact that an autopsy of the victim's body took place 42 months after his death, "at which time the body was putrefied" and less susceptible to examination).

Critically, we have held that "it is not our function to 'second-guess'" the government's timeline in bringing an indictment absent a showing that *both* factors—actual prejudice and the government's deliberate, tactical delay—are present. *Comosona*, 614 F.2d at 696 (quoting *United States v. Francisco*, 575 F.2d 815, 817 (10th Cir. 1978)).  In other words, a defendant must satisfy *both* parts of the two-pronged test in order to obtain any relief for pre-indictment delay, including dismissal of the indictment on the ground of excessive delay.  *See Garcia*, 74 F.4th at 1106 (finding that the defendant failed to show error in the district court's denial of his motion to dismiss for pre-indictment delay because he could not show *either* actual prejudice or "any motive by the Government to gain tactical advantage").

**3**

In the specific context of motions to dismiss indictments for pre-indictment delay, we have articulated particular factors that courts must consider in reviewing such motions.  Specifically, in *Comosona* we articulated a test to apply when "determining whether dismissal is appropriate for pre-indictment delay": (1) "there must be demonstration of actual prejudice to the defendant resulting from the delay. Generally, such prejudice will take the form of either a loss of witnesses and/or physical evidence or the impairment of their effective use at trial"; (2) "the length of delay must be considered"; and (3) "the Government's reasons for the delay must be carefully considered."  614 F.2d at 696.  This test is part of the overall "balancing process" set forth by the Supreme Court.  *Id.*

47

Notably, in *Comosona* we provided a context for considering these factors by establishing a burden-shifting framework, which requires the defendant to establish a prima facie case of actual prejudice. *See id.* at 696–97. Thus, the defendant must first make a prima facie showing that "the delay in charging him has actually prejudiced his ability to defend, and that this delay was intentionally or purposely designed and pursued by the Government to gain some tactical advantage over or to harass him." *Id.* Upon that showing, the government must then demonstrate that "the delay was not improperly motivated or unjustified," at which point the defendant "bears the ultimate burden of establishing the Government's due process violation by a preponderance of evidence." *Id.* at 697.

It is noteworthy that this prima facie case requirement in *Comosona*'s burden-shifting framework embodies, in substance, the same two-part test derived from *Lovasco*. *See* 431 U.S. at 789–91. Thus, at the threshold stage, in demonstrating that pre-indictment delay warrants dismissal of an indictment under *Comosona*'s burden-shifting framework, a defendant, in effect, must satisfy *Lovasco*'s two-part inquiry. Significantly, this underscores that—irrespective of the relief sought—a defendant must satisfy this two-part inquiry before we will "second-guess" the government's timing in bringing criminal charges. *Comosona*, 614 F.2d at 696 (quoting *Francisco*, 575 F.2d at 817). In other words, whether the defendant is seeking dismissal of the indictment on the grounds of pre-indictment delay through invocation of *Comosona* or not, or the defendant is seeking another form of relief entirely for such delay, at

48

the threshold, the defendant must establish actual prejudice and the government's

deliberate delay in pursuit of a tactical advantage.[20]

---

[20]     This overlap between the prima facie requirement in the specific context of a motion to dismiss the indictment under *Comosona* and the two-part inquiry of *Lovasco* has resulted in some seeming variation in the methodology that courts in our circuit have used.  Some courts, even when reviewing appeals stemming from the denial of a motion to dismiss, have not mentioned *Comosona* or its burden-shifting framework at all, but rather have simply employed the two-part inquiry derived from *Lovasco*.  *See Trammell*, 133 F.3d at 1351; *Mitchell*, 558 F. App'x at 833–34; *United States v. Lowe*, No. 23-2114, 2024 WL 1461253, at *2 (10th Cir. Apr. 4, 2024) (unpublished).  Others, in the same motion-to-dismiss setting, have cited *Comosona*, and then—with or without mentioning *Comosona*'s burden-shifting framework— have moved on to employ the two-part inquiry.  *See Garcia*, 74 F.4th at 1099; *United States v. Woodard*, 817 F. App'x 626, 628 (10th Cir. 2020); c*f. United States v. Vap*, 852 F.2d 1249, 1252 (10th Cir. 1988) (applying the *Comosona* burden-shifting framework without reference to *Lovasco*).

     "[W]e recognize that 'we must endeavor to interpret our cases in a manner that permits them to coexist harmoniously.'"  *United States v. Mier-Garces*, 967 F.3d 1003, 1018 (10th Cir. 2020) (quoting *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019)).  And, having carefully studied the relevant cases, we conclude that they do coexist in this manner.  Specifically, because of the substantive overlap between the threshold, prima facie stage of the *Comosona* test and the *Lovasco*- derived two-part inquiry, we see that all of these cases are substantively congruent. That is, they all impose, in effect, the same substantive burden on defendants at the threshold.  Thus, even where defendants seek dismissal of the indictment for pre- indictment delay and thus *Comosona*'s burden-shifting framework ordinarily would be implicated, to the extent that defendants fail to overcome the two-part inquiry, our panels' failure to expressly rely on *Comosona*'s burden-shifting framework or even to cite *Comosona* is substantively of no moment.  Given the threshold overlap, *Comosona* only would have a distinctive role to play—in cases seeking dismissal of the indictment—where defendants are able to satisfy the prima facie test; at that point, the two other burden-shifting stages would be triggered.  However, the defendants in the cases we have examined herein have failed to satisfy that prima facie test.  Therefore, whether the panels expressly cited *Comosona* or relied on its burden-shifting framework, or simply employed the two-part inquiry—centered on a showing of  actual prejudice and the government's deliberate delay in pursuit of a tactical advantage—is of no substantive moment.  In effect, the analysis would demand that, at the threshold, the defendants carry the same burden as found in the

**B**

**1**

Here, without explicit reference to *Comosona*'s burden-shifting framework, the district court undertook the two-part inquiry and determined that Mr. Murphy could not satisfy "either part of the test." R., Vol. I, at 249 (Order Den. Mot. to Dismiss for Pre-Indictment Delay, filed Feb. 18, 2021). First it assessed Mr. Murphy's claim that he was prejudiced by the death of potential defense witnesses, and concluded that his argument was "speculative at best, because he provide[d] no specific indication as to how they would have testified except to claim they would have contradicted their statements to law enforcement made twenty years ago." *Id.* at 250.

Acknowledging that Mr. Murphy's failure to satisfy the first part of the inquiry, without more, would suffice to sink his motion to dismiss, the district court nevertheless moved on to the second part of the inquiry and found that his argument there was unsuccessful as well. The court found that Mr. Murphy "made no showing that the Government purposefully delayed charging him to gain a tactical advantage or to harass him." *Id.* As the court reasoned, Mr. Murphy's prosecution was in direct response to a critical development that was not instigated by the prosecution, and it did not emerge until 2020—that is, the Supreme Court's issuance of *McGirt* and the Court's application of that precedent to Mr. Murphy's appeal. As the district court

---

prima facie case of *Comosona*, and, in the cases examined herein, they have failed to do so. And, for the reasons explicated *infra*, Mr. Murphy fares no better.

said, "only in July 2020 did the Supreme Court declare that Oklahoma lacked jurisdiction to charge [Mr. Murphy]." *Id.* Therefore, it determined that Mr. Murphy could not even show that the government's delay was negligent, "let alone purposeful and designed to gain a tactical advantage at trial or to harass [him]." *Id.*

For the reasons that we explain below, we conclude that the district court did not abuse its discretion in reaching that conclusion.

**2**

Like his failure in district court, Mr. Murphy has given us no grounds to second-guess the timing of the government's prosecutorial charging decision. He has not shown that he can satisfy either prong of the two-part inquiry. In effect, then, he cannot make out the prima facie showing that *Comosona* requires. Therefore, his due process claim must fail.

First, Mr. Murphy argues that he was prejudiced by the federal government's twenty-year delay in prosecuting him, contending that "the very passage of two decades is inherently prejudicial." Aplt.'s Opening Br. at 31. Yet, "[v]ague and conclusory allegations of prejudice resulting from the passage of time are insufficient to constitute a showing of actual prejudice for the purposes of preindictment delay." *Garcia*, 74 F.4th at 1099 (quoting *Colonna*, 360 F.3d at 1177). Indeed, though courts must consider it, the length of the delay is "not enough standing alone" to establish prejudice. *Id.* at 1103. Beyond that vague assertion, Mr. Murphy does not identify any favorable witness

testimony or evidence that was lost or otherwise affected by the delay.[21]  *See Comosona*,

614 F.2d at 696; *see also Garcia*, 74 F.4th at 1101, 1103 ("The death of the two potential

witnesses here similarly does not demonstrate actual prejudice. . . . [T]he loss of

evidence, without more, is insufficient to support a claim of unconstitutional pre-

indictment delay.  The defendant must show actual prejudice.").  This absence of any

alleged practical harm caused by the pre-indictment delay fatally undercuts Mr. Murphy's

claim of prejudice.

Though we may stop our analysis there, the district court also correctly held

that Mr. Murphy cannot meet the second prong: that is, he cannot show "that the

delay was purposefully designed to gain tactical advantage or to harass [him]."

*Garcia*, 74 F.4th at 1096 (quoting *Revada*, 574 F.2d at 1048).  Indeed, Mr. Murphy

implicitly concedes that the delay was in fact due to circumstances entirely out of the

government's control.  *See* Aplt.'s Opening Br. at 30–31 ("The reason for the twenty

year delay in securing the federal indictment was the false assumption of state

jurisdiction, in complete derogation of the long-standing law upon which the

Supreme Court majority in *McGirt* relied.").  Despite his effort to elide this obvious

---

[21]    Before the district court, Mr. Murphy maintained that the delay prejudiced him because he could not call Kevin and Mr. Long in his federal trial to testify as to his intoxication on the night of August 28, 1999.  Both Kevin and Mr. Long died sometime between Mr. Murphy's state trial in 2000 and his federal trial in 2021.  But Mr. Murphy does not raise this argument again on appeal, meaning that he has waived it, and we will not consider it.  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived.  And, ordinarily, we will decline to reach the merits of waived issues.").

fact, the delay in bringing a federal indictment against Mr. Murphy resulted from the historically well-rooted—but mistaken—understanding that the State of Oklahoma maintained criminal jurisdiction over the area of McIntosh County at issue here. *See McGirt*, 140 S. Ct. at 2470. The federal government did not even understand itself to have the option of prosecuting Mr. Murphy until 2020—let alone did it "purposefully design[]" the delay to "gain tactical advantage or to harass [Mr. Murphy]." *Garcia*, 74 F.4th at 1096 (quoting *Revada*, 574 F.2d at 1048).

Because Mr. Murphy cannot carry his burden under the two-part inquiry—*viz.*, he cannot show actual prejudice or government delay for tactical advantage—in effect, he cannot satisfy the prima facie showing that the *Comosona* burden-shifting framework imposes. *See* 614 F.2d at 696–97. Therefore, his pre-indictment delay claim fails at the threshold.

\*\*\*

Mr. Murphy fails to demonstrate that the twenty-year delay in bringing the federal prosecution against him violated his Fifth Amendment due process rights. Accordingly, we uphold the district court's order denying his motion to dismiss the indictment for pre-indictment delay.

## VI

Our reversal of Mr. Murphy's convictions on Counts Two and Three necessitates remand to the district court for resentencing, even though his conviction for second-degree murder under Count One still stands. The district court imposed life sentences for each of the three counts upon which Mr. Murphy was convicted and

ordered the sentences to run concurrently. But only the life sentences for the two kidnapping-related convictions—which we reverse—were mandatory because the death penalty was off the table, for the reasons discussed *supra*, and the *minimum* alternative sentence for these offenses was life. *See* 18 U.S.C. § 1111 ("Every murder . . . committed in the perpetration of, or attempt to perpetrate, any . . . kidnapping . . . is murder in the first degree. . . . Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life."); 18 U.S.C. § 1201(a) ("Whoever unlawfully . . . kidnaps . . . any person . . . and, if the death of any person results, shall be punished by death or life imprisonment."). As to Mr. Murphy's second-degree murder conviction under Count One, life is the maximum sentence, and it is not mandatory. *See* 18 U.S.C. § 1111(b) ("Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life."). Thus, if Mr. Murphy had been convicted of only second-degree murder, the district court would have had the discretion to sentence him to something other than life imprisonment.

And "[u]nder the 'sentencing package' doctrine, 'after we vacate a count of conviction that is part of a multi-count indictment, a district court "possesses the inherent discretionary power" to resentence a defendant on the remaining counts *de novo* unless we impose specific limits on the court's authority to resentence.'" *United States v. Jackson*, 82 F.4th 943, 949 (10th Cir. 2023) (quoting *United States v. Hicks*, 146 F.3d 1198, 1202 (10th Cir. 1998)). We impose no such limits here. Because the district court has the discretion to sentence Mr. Murphy to less than life

imprisonment on his remaining viable count of conviction for second-degree murder, we vacate his sentence and remand to the district court for resentencing.

## VII

For the foregoing reasons, we **REVERSE** Mr. Murphy's convictions under Counts Two and Three of the superseding indictment but **AFFIRM** his conviction under Count One. We **VACATE** the district court's sentencing judgment as to Count One, and **REMAND** the case for resentencing and any further proceedings consistent with this opinion.